Of all the powers of the court of chancery, there is none which requires in its exercise greater caution than the power to issue a preliminary injunction ex parte, without notice to the defendants. The granting of interlocutory restraint, even after reading affidavits for the defendants and after hearing the argument of their counsel, must generally rest upon a case free from substantial doubt. Much more so when the defendants have no opportunity to be heard. Then must the judge study the complainant's affidavits with a suspicious eye. Usually, he should disregard words which express only a conclusion — fraudulent, insolvent, unlawful, conspiracy, intimidation, coercion, and the like — and put his faith on the bare, detailed facts. When satisfied of the probable facts of the case, then arise the questions whether they constitute a clear equitable cause of action and whether a delay of two or three days, to let in the defendants to be heard, will likely cause complainant to suffer damage, irreparable in kind and substantial in extent. Only after a scrutiny of this sort has led to a conviction that the merits of the application are clear, should an ex parte
injunction be awarded.
If there be one class of cases, in which more than in others the court should proceed carefully, it is in labor disputes, where an employer seeks to enjoin labor unions in respect to a strike. Such suits touch a multitude of persons *Page 504 
in a matter which is of vital importance to them. The facts are almost always in sharp controversy, and the branch of the law which governs is developing rapidly and is still unsettled in many important respects. Yet when the judge has carefully read the affidavits and is fully satisfied of their probable truth, and that they disclose a clear cause of action, and that serious irreparable damage is immediately threatened, then without further hesitation the full power of the court must be extended for the protection of complainants. It is in this spirit that I have considered the present application.
The complainants are the Master Weavers Institute and fifty-nine silk manufacturers, members of the Institute. The defendants are the United Textile Workers of America, five local unions and eight individuals. The complainants move for an order to show cause and that, in the meantime, "the defendants, their respective officers, representatives, agents and attorneys, and each and every one of them, and all persons associated with or acting in concert or in combination with them, be and they are hereby enjoined and restrained as follows:
"a. From directly or indirectly encouraging, persuading, inducing, or attempting to encourage, persuade, or induce any personal employes, groups of persons, employes, union, or association, to breach any labor agreement or contract existing between any employe, group of employes, union, or association and the complainants herein or any of them, including the contract entered into on October 24th, 1933, between the Master Weavers Institute and said local unions; and from indirectly or directly encouraging, persuading, inducing, or attempting to encourage, persuade or induce any persons, employes, groups or persons or employes, union or association to fail to carry out, observe, perform or comply with any of the terms of any labor agreement or contract existing between any employe, group of employes, union or association and the complainants herein or any of them, including the contract entered into on October *Page 505 
24th, 1933, between the Master Weavers Institute and said local unions.
"b. From calling or declaring a strike of the employes of the complainants in violation and in breach of the aforementioned agreement of October 24th, 1933, and from in any manner inciting, persuading, or ordering any employe of complainants to leave any complainant's employment.
"c. From personal molestation of persons being willing to be employed by the complainants or any of them, with intent to coerce such persons to refrain from entering such employment.
"d. From addressing persons willing to be employed by complainants, or any of them, against their will, and thereby causing them personal annoyance, with a view to persuading them to refrain from entering such employment.
"e. From loitering or picketing in the streets or on the highways or public places near the sites of any of the complainants' works, or the places in which complainants' officers and employes live, or near any premises with intention to procure the personal molestation and annoyance of persons willing to be employed by the complainants, or causing the employes of complainants to refrain from or refuse to remain in the employ of complainants or from entering the sites of complainants' works.
"f. From violence, threats of violence, insults, indecent talk and abusive epithets, annoying language, acts or conduct, practiced upon any person without his or her consent and with intent to coerce any person to refrain from entering the employment of complainants or any of them, or entering the property or sites of complainants or any of them.
"g. From attempting to cause any person employed by complainants or any of them, to leave such employment by intimidation or annoying such employee by annoying language, acts or conduct.
"h. From picketing any of the places upon which complainants, or any of them, are working, or the places of *Page 506 
residence of any of the complainants' employes, and from parading past or around or in the vicinity of the places upon which complainants or complainants' employee are working, or the residences of complainants' employes.
"i. From going either singly or collectively to the home of any of the persons willing to be employed by the complainants for the purpose of intimidating, urging, annoying or coercing any or all of them.
"j. From interfering with, hindering or obstructing complainants' work and the members' business in any manner.
"k. From in any manner and by any means molesting or interfering with employes of complainants, or any of them, in going to or returning from their daily labor.
"l. From boycotting or attempting to boycott complainants, or persons willing to be employed by complainants, in any manner whatsoever.
"m. From ordering, commanding, directing, assisting, aiding or abetting, in any manner whatsoever, any person or persons to attempt to commit, or to commit, any or either of the aforesaid acts.
"n. From encouraging, persuading, inducing and attempting to encourage, persuade and induce any persons, from promoting, encouraging, directing, or participating in, in any manner whatsoever, any strike against the complainants or any of them.
"o. From doing any acts or things whatever to restrict complainants or their employes from the free and unhindered control and conduct of said complainants' businesses, and from causing persons willing to be employed by any complainants to refrain from doing so by annoying language, acts or conduct."
I have quoted the proposed injunction in full that its sweeping and drastic character might be observed. Counsel inform me that its terms — except in regard to the contract — are copied from an order of this court made in another cause some years ago. But surely the facts proved in that case must have been extraordinary to have called it forth. Injunctions cannot be readily standardized; they must be *Page 507 
moulded to fit the particular situation and can go no further than the proofs in the instant case require.
Complainants lean heavily on the alleged contract of October 24th, 1933. Perhaps it would be enough for me to say that there is no proof of the execution of the contract, but I surmise this deficiency could be remedied, so I will assume that the agreement was actually made by the Master Weavers Institute and four defendant local unions. The document, which is quite long, deals with collective bargaining, wages and hours of work. The paragraphs most nearly pertinent to the present suit are these:
"14. In the event of a general strike in the silk industry, no employer shall do any weaving or manufacturing for any person, firm or corporation whose employes may be on strike at that time.
"15. This agreement shall commence on the date hereof and shall continue in force until March 31st, 1935, providing, however, that either party may rescind this contract by giving seventy-five (75) days' written notice by registered mail to the other party of its intention so to do.
"16. Immediately upon the execution of this agreement, the employes of each shop will appoint a shop committee whose duties and function it shall be to adjust, as far as possible, all grievances of employes. Adjustments of grievances to take place after working hours.
"18. Any national legislation binding upon the manufacturer or employe alike, is to be considered as part of this contract.
"19. If any employer, a member of the Institute, is prevented by the acts of the members of the unions, a party to this contract, or by any other concerted labor activities from operating his plant, or upon the failure of his employes to report for work at any time, then this contract to be null and of no effect.
"20. This agreement is not to be construed in any respect as creating a closed shop."
It certainly is not clear that the local unions, which signed this contract, violated its terms in any respect when *Page 508 
they called, or aided — if they did so — a strike against the members of the Institute. The agreement does not expressly bind the unions not to strike; they do not promise to furnish workmen to the members; and the members of the Institute are left free to employ non-union men. Section 14 perhaps raises an implication that the members shall be exempt "in the event of a general strike in the silk industry." And it might be argued that section 15 requires an attempt at adjustment by the shop committee, before a strike is called. On the other side, section 19 contemplates that the employes may be prevented from operating their shops by the acts of members of the unions.
Complainants' rights under the contract are not sufficiently obvious to permit an injunction of the type which they seek.
Twenty-three affidavits were filed with the bill of complaint, and strangely enough they mention only twelve of the sixty complainants, and they do not even introduce the defendant unions in connection with any of the acts complained of. One of the individual defendants, Henry Ross, is repeatedly named, and three others, William B. Smith, Eli Keller and Alexander Williams, appear once each.
The president of complainant Doblin Company makes oath that on Friday, September 7th, Williams and another man called on deponent. Williams "told me that if I did not instruct my workers to stop work immediately, he would have a picket line around my shop before the day was over, and that he would get the workers out in that way." The following Monday (the next working day), none of the workers reported for work. It does not appear that a picket line was formed, or that the threat made to Doblin was communicated to his employes.
The affidavit of the president of Julius Breuer Sons sets forth that on September 12th he saw Keller leading a picket line in front of the Breuer plant. The pickets were shouting: "Come out of the plant, you dirty scabs, you yellow bellies." It is not shown whether or not any employes of Breuer have ceased work. *Page 509 
Edward Doerke, treasurer of Audiger Meyer Silk Company, swears that on September 12th Smith came to their plant "and informed me that the plant would have to be closed down." Whether Smith was a friendly neighbor or a labor union agent, or what, is not disclosed.
The following day, Ross appeared in front of the plant with a large mob. He entered and told Doerke: "The pickets outside are out for blood. If your workers come out now, I can chase the pickets away, but if your workers come out later, I will not be able to control the pickets. * * * My hands are tied; the national strike supersedes the contract."
The same afternoon, when the employes were leaving the plant, a riot occurred and several persons were injured. The following morning, the employes had a meeting and decided to quit work, not because they wished to strike, but because of fear of bodily injury. The rioting is abundantly proved by a dozen affidavits.
Ross appeared at several other mills. The head of the shop committee of Bernstein Zahler was told September 4th to have his men leave work at once and this they did. On September 5th Ross unsuccessfully attempted to induce the workers of Goodman 
Thiese and Empire Silk Company to quit, and he instructed employes of Doblin Company to leave the shop. He telephoned the men at Dubin Silk Manufacturing Company to go out on strike and they did so. The next day he told the chairman of the workers' shop committee of the Luxite Silk Company that unless the workers came out immediately, he would have a few thousand pickets there and there would be trouble. The plant was forced to close by this threat.
A week later, September 13th, Ross came with a crowd or delegation to Frick Eaton. He told the president of the company "that he wanted the shop closed, upon orders from his superiors, * * * that if the plant was not closed up peacefully, a crowd of people would come to the plant to picket and he would not be responsible for what happened." The affidavits are silent as to what ensued. *Page 510 
Several affidavits refer to Ross as "representative of the local labor unions," others state that in October, 1933, Ross, Williams and Keller were representatives of Local 1716, Branch 11, of the American Federation of Silk Workers, for the purpose of executing the contract already discussed.
It is perfectly evident, from this review of the facts, that there is no basis for an injunction, or even an order to show cause, against William B. Smith or any of the labor unions. The proofs do not connect them with disorder or with the strike. Williams is shown to have threatened Doblin Company with a picket line September 7th; Keller actually led a disorderly group of pickets September 12th; Ross was involved in eight incidents — the first five presumably lawful; but at the Luxite mill, Frick 
Eaton's, and at Audiger Meyer, he threatened or at least foretold disorder, and in the last case, his prophecy was amply fulfilled. There seems to be ground for action by some of the complainants against these three men; but it is not my function to sort over the sixty complainants and to find among all the proposed restraints the few that fit the facts. The amount of chaff is too great; the grains of wheat too few.
The motion is denied without prejudice to a renewal of the application after the papers have been more carefully prepared. *Page 511