Isolantite, Inc., one of the complainants, is a manufacturing corporation, located in Belleville. On May 10th, 1940, it entered into contract with its co-complainant, Chemical Oil Workers Union No. 2206, which had been chartered by the American Federation of Labor a year earlier. The contract, besides provisions for hours, wages, grievances, c., recognized the union as exclusive bargaining agent for the employees. This contract expired May 10th, 1941. About a month in advance of that date, negotiations for a new contract were begun between the company and the union, and were continued until June 20th, 1941, when a new agreement was executed. It provided for an increase of wages, retroactive to May 10th, for another increase to be effective November 10th, and for a readjustment of wages based upon a cost of living index May 10th, 1942. This contract will remain in force until December 31st, 1942. It continues the union as exclusive bargaining agent and embodies these provisions:
"2. The Company agrees to employ or retain in its employ only members in good standing of the Union, provided that new employees not members of the Union may be employed when there are no qualified persons on the Company's unemployed seniority list, upon condition that they shall become and remain members in good standing of the Union within two (2) weeks after being employed. * * * *Page 508 
"14. It is mutually agreed that there shall be no strikes, walkouts, slowdown, lockouts, or any interruption of work during the period of this agreement due to and between any member of the Union individually, or collectively, and representatives of the Company."
On September 22d, the union wrote the company:
"Mr. Joseph Melchionne has been given a trial and expelled from this Union by the Executive Board Members of Local No. 22,026, the charges are discrimination against our Union Membership. In accordance with our agreement with your company, Mr. Melchionne is to be dismissed from his job immediately."
The following morning, Melchionne was discharged pursuant to the union's demand. Forthwith, a large number of the employees went on strike, formed a picket line in which were displayed placards reading:
 "Isolantite on Strike We want C.I.O. A.F. of L. unfair. Contract illegal. Help us Win."
The same day, the defendant United Electrical Radio Machine Workers of America, a union affiliated with the Congress of Industrial Organizations, petitioned the National Labor Relations Board for investigation and certification of employees' bargaining representatives, pursuant to section 9(c) of the National Labor Relations Act. There followed on September 29th, a conference with Mrs. Elinore N. Herrick, Regional Director of the Board, at her office in New York, attended by representatives of the company and of the rival unions. On October 1st, the board dismissed the petition.
On October 10th, the bill of complaint in this cause was filed praying for an injunction against all picketing and for less drastic relief, and at the same time complainants moved for an order to show cause with interim restraint. This action was taken in the presence of counsel for all the defendants on two days' notice, pursuant to Chancery rule 212. Witnesses for both sides were examined and cross-examined *Page 509 
in open court. An order to show cause was thereupon made, returnable October 21st, and which restrained defendants:
"(a) From gathering, parading or patrolling, loitering or picketing about the premises of complainant, or the public street or sidewalks approaching thereto, or in the vicinity thereof, particularly on Cortlandt Street between Holmes and Joralemon Streets; provided, that not more than ten pickets may peaceably walk up and down the sidewalks of the street in front of complainant's plant upon condition that they maintain a space of at least ten feet between each such picket and that they or any of them do not obstruct the entrance to the plant or molest or interfere with the entry into or egress from said plant by any employees, servants or agents of complainant or any person having business with complainant;
"(b) From violence or threats of violence or intimidation practiced upon any person now employed or hereafter to be employed by complainant, or who is willing to be employed by complainant;
"(c) From using obscene or insulting language:
"(d) From intercepting, molesting or following any person now employed or hereafter to be employed by complainant, or who is willing to be employed by complainant on his or her way to or from complainant's plant; or at any other place;"
The order further provided:
"Defendants shall serve answering affidavits by October 18th, 1941, and the hearing upon the return hereof shall be held on the affidavits annexed to the bill, answering affidavits so served, testimony taken this day, and proofs presented upon the return hereof on such issues, and within such limits as the court shall then determine."
On motion of the defendants, the hearing of the order to show cause and the restraints were continued until November 5th. The hearing has been concluded and the matter is ripe for decision.
Defendants say that the interim restraining order was erroneous in that it was effective for longer than five days, contrary toP.L. 1941 ch. 15 § 3. The point is academic since the restraint was continued from October 21st on motion *Page 510 
of defendants themselves. Furthermore, the statutory provision on which defendants rely applies only to orders made without notice to the defendants and not to an order on notice such as was made in the present suit.
Defendants also urge that the same section of the statute requires that decision on the order to show cause be based solely on the testimony produced in open court, and not at all on the affidavits annexed to the bill or the testimony taken on the motion for the order. In aid of the interpretation of section 3, the public policy of the state is declared in section 2. Namely, that a procedure that permits injunctive relief "based upon written affidavits alone, and not wholly or in part upon examination," of witnesses in open court, is subject to abuse. The statute then forbids the issuance of an injunction "except after hearing the testimony of witnesses in open court." It is plain that the use of affidavits is not banned; the statute is satisfied if the injunction is based in part upon proofs taken in open court. For a fuller understanding, another sentence should be quoted from section 2:
"Determination of issues of veracity and of probability of fact from affidavits of the opposing parties that are contradictory and, under the circumstances, untrustworthy, rather than from oral examination in open court is subject to grave error."
The legislature in enacting this statute, took cognizance of the usual circumstance, that many, indeed most, of the facts which constitute the basis for an injunction are undisputed; that the factual controversy is confined to two or three issues. In the present case, for instance, none of the facts which I have so far related are disputed. The legislature did not intend that time should be wasted taking proofs in open court, of matters uncontroverted, but rather that the court should in some manner determine what are the real issues, and should then hear evidence on those issues. To that end, the order to show cause herein requires answering affidavits to be filed. A comparison of the affidavits submitted by complainants and defendants disclosed the issues between the parties and the testimony taken at the hearing was limited accordingly. *Page 511 
As a general rule, when the material allegations of a bill of complaint are met by full, explicit and circumstantial denial under oath, a preliminary injunction will not issue. The court does not attempt to sift out the truth from conflicting exparte affidavits. Heine, Inc., v. Truck Drivers Local, c.,129 N.J. Eq. 308. But the statute which I have cited clearly changes this rule. After stating that determination of facts from contradictory affidavits, rather than from oral examination of witnesses, is subject to grave error, it directs the court to hear the testimony of witnesses and to find the facts. The old rule still governs as to those allegations of the bill which are supported only by ex parte affidavits. But as to allegations which are the subject of oral testimony, the court must weigh the evidence. An injunction cannot be refused, as formerly, merely because of a denial upon oath.
On September 23d, immediately before the strike, the company had about 575 employees. If all absentees from work are supposed to be strikers, then 300 went out on strike; but of these 45 returned to work the next day and a dozen later on, so that the strikers numbered about 244 when the evidence was taken. Meanwhile the company had employed 175 new men and girls and so had some 70 fewer employees than just before the strike began.
By request of the office of production management, all the employees have been using a single entrance to the plant — a precaution against sabotage. Immediately in front of this entrance, at each change of shifts, from September 23d until October 10th, when the injunction was granted, 30 or 40 pickets paraded, in two lines going in opposite directions, each picket about two feet behind the one in front of him. The line of pickets nearest the plant marched parallel with the wall of the building and about two feet away from it. Close beyond this line of pickets was the other line, moving in the reverse direction. On the opposite side of the street, 100 to 200 strikers and sympathizers cheered the pickets and booed the employees. Employees entering or escaping from the factory had either to break a way through the picket lines or run the gauntlet along the narrow passage between the pickets and the factory, to the end of the picket line. Daily *Page 512 
there was shouting of insults, scratching, kicking and hitting. The small police force of Belleville was constantly in attendance, doing their best to preserve order, making some arrests.
Naturally, there is much conflict in the proofs concerning each individual affray, especially as to who started it. "She called me a bum and then I called her a rat." "He shoved me first." "I did not even see him until he kicked me." But these details are unimportant. All the breaches of the peace were the natural and proximate result of the tactics deliberately adopted by the defendants. It was the purpose of the defendants to make the position of the employees so disagreeable that they would quit their jobs.
It would seem hardly necessary to state that the employees have a right — not a privilege, but a right — to go to and from their work, freely, without hindrance whatever. As freely as if they were going to church. And the employer has a corresponding right that his employees be unmolested. Yet I received the impression at the hearing that the defendants believed the law on their side. There have been so many instances in which high officials of state and nation have permitted and even encouraged strikers to besiege the plants where they had been employed, and to block public highways, and to assault others who wished to work, that it is not altogether surprising that young men and women like the defendants have imbided the idea such acts are lawful when done by strikers.
The statute already cited requires the court before issuing an injunction to file findings of the following facts.
"(a) That unlawful acts have been committed and are likely to be continued unless restrained;
"(b) That substantial and irreparable injury to complainant's property will follow unless the relief is granted;
"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial thereof than will be inflicted upon defendants by the granting thereof;
"(d) That complainant has no adequate remedy at law."
And it further provides that the injunction "shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition *Page 513 
filed in such case and as shall be expressly included in said findings of fact."
I find that the unlawful acts above related have been committed and that acts of a similar nature are likely to be continued unless restrained. Of course, I do not find that the particular act, for instance, the assault by John Doe on Richard Roe, is apt to be repeated. The evidence of threats as distinguished from actual violence was so conflicting that I make no finding that there were such threats. Also, there were collisions between strikers and non-strikers away from complainants' plant; but the meetings may have been casual; it did not appear that they came from a deliberate following or intercepting of the employees by strikers. There has been intimidation by acts, however. Furthermore, I find that if mass picketing — a term used by some of the defendants' witnesses — and violence are prohibited but not threats of violence or intercepting or following the employees, then it is probable that defendants will adopt these tactics.
The statute should be construed to require the court, first, to look into the situation complained of — to find the facts — and second, to estimate how the situation will probably develop if no injunction be granted. Then the court may enjoin any unlawful acts which the court anticipates would otherwise be committed. The injunction must be as specific as the nature of the case permits. Further than this, the legislature, in my opinion, did not intend to go; but even if the legislature so intended, it is without authority to impair the right of suitors or the power of Chancery to grant relief. Decisions on the Norris-LaGuardia Act are of little value, although the language of the two statutes is much alike, for Congress has power to destroy the federal courts (except the Supreme Court) and to limit their jurisdiction at will.
I further find that substantial and irreparable injury to complainants will follow unless relief is granted and that complainants have no adequate remedy at law.
The statute further requires that the court find "as to each item of relief granted, greater injury will be inflicted upon complainant by the denial thereof than will be inflicted upon defendants by the granting thereof." *Page 514 
In my opinion, no other effect can be given to this mandate than that the court should apply the doctrine of balancing the conveniences. Let us look at the statutory provision literally. How much injury will be inflicted upon the defendants by forbidding them from insulting, threatening or assaulting the employees? Surely this is a strange inquiry in a court of justice. It may be answered that when defendants are enjoined from committing tortious acts, any loss sustained by them isdamnum absque injuria, and that any injury which would fall upon complainants from a denial of the injunction, would be the greater injury. The strike leaders testifying in this case, said that the injunction had had a dispiriting effect on their followers; that many were discouraged and that the strike would probably be lost if the injunction was continued. Let us suppose that thereby the C.I.O. union would lose a large sum in dues. I am quite satisfied that the legislature cannot deprive complainants of the appropriate remedy because tort feasors would thereby suffer. "That would be a disgraceful state of the law," as was said by Chief-Justice Beasley in Higgins v. FlemingtonWater Co., 36 N.J. Eq. 538.
On an application for an interlocutory injunction when the respective rights of the parties are not clear, the court considers what injury the defendant would suffer from an injunction, assuming that he shall prevail at final hearing and what injury might be done complainants if the injunction be denied and yet complainants should finally win. This is the balancing of conveniences. It is a factor on practically every application for an interlocutory injunction. Chetwood v.Brittan, 2 N.J. Eq. 438; Clark v. Wood, 6 N.J. Eq. 458; MorrisCanal, c., Co. v. Jersey City, 11 N.J. Eq. 13; Furman v.Clark, Ibid. 136; Jones v. Newark, Ibid. 452; Hinchman v.Paterson, c., Co., 17 N.J. Eq. 75; Erie Railroad Co. v.Delaware, Lackawanna and Western Railroad, c., Cos., 21 N.J. Eq. 283; Scanlan v. Howe, 24 N.J. Eq. 273; Higgins v.Westervelt, 44 N.J. Eq. 254; Delaware, Lackawanna and WesternRailroad Co. v. Breckenridge, 56 N.J. Eq. 595; Simmons v.Paterson, 60 N.J. Eq. 385; General Investment Co. v. BethlehemSteel Corp., 88 N.J. Eq. 237; *Page 515 Christiansen v. Local 680, c., 127 N.J. Eq. 215; Van Buskirk
v. Sign Painters, c., Ibid. 533.
In the present case, the right of the complainants to have all picketing enjoined appears to me doubtful. I have considered that limited, orderly picketing would probably not injure complainants so much as a total ban on picketing would injure defendants, and on this balancing of the conveniences, I am denying that branch of relief. But the conveniences are only balanced in case of doubt as to who is in the right. They are not balanced in order that defendants may continue conduct which is plainly tortious.
The number of pickets was limited to ten by the original order because that number seemed large enough fully to apprise the public, the employees and all others concerned, of the existence of a labor dispute and to enlist sympathy on the side of the strikers. And also seemed small enough to avert intimidation or obstruction of the highway. Some limitation is necessary to prevent the recurrence of violence; just how many pickets should be permitted cannot be determined mathematically. At the hearing, the two leaders of the strike were asked how many pickets they thought they should have. One of them was unwilling to make an estimate before consulting his fellows. The other said that they should have all the strikers, 240, on the picket line. In my opinion, the only purpose of such a large number of pickets would be intimidation and the natural result would be rioting. In the absence of evidence to the contrary, I find that ten pickets is enough, yet not too many.
Defendants argue that the limitation on the number of pickets violates their constitutional freedom of speech as recently interpreted by the United States Supreme Court in Thornhill v.Alabama, 310 U.S. 88; 60 S.Ct. 736; A.F. of L. v. Swing,312 U.S. 321; 61 S.Ct. 568. I do not so understand these decisions. The fundamental concept of free speech is the right to appeal to the reason, the sentiment and the prejudices of the parties whom the speaker desires to move. It does not include the right to reinforce such appeals with violence, threats, intimidation, or coercion of any kind. Milk Wagon Drivers Union v. MeadowmoorDairies, 312 U.S. *Page 516 289; 61 S.Ct. 552. Nothing in the restraints which have been imposed in this case, interferes with free speech or reduces the effectiveness of defendants' propaganda except by excluding the argument of force.
The statute, P.L. 1941 ch. 15, requires that relief be denied unless complainants have made "every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." Section 4. This provision is taken verbatim
from section 8 of the Norris-LaGuardia Act. Under that act, it has been uniformly held to be the general rule that complainant must show that he has made every reasonable effort to settle the dispute in one of the three ways mentioned. Teller on LaborDisputes § 221. I stress the adjective "reasonable" and find that the complainants have made such effort.
From the beginning of April to the latter part of June, the company and agents of the employees bargained on conditions and terms of employment. In the negotiations, representatives of the United States Department of Labor and of the O.P.M. took an active part. The result was the contract already mentioned. There has been some suggestion that the negotiators who purported to represent the workmen were not, in fact, authorized to speak for them. But the company had no notice of any invalidity in their credentials. All the employees stood by in silence, knowing who was acting in their name. It is now too late to attack their authority.
We may inquire what is the dispute between the company and the defendants. The defendants say that they have two grievances — that the company discharged Melchionne and that it recognizes complainant union as bargaining agent. As to the latter: Substantially all the employees at the time the contract was made were members of the A.F. of L. union and a great majority of them continued to be members of that union until the time of the strike. Perhaps 150 out of 575 had secretly joined the C.I.O. union before then. Many more, the first day of the strike, signed applications for membership in the C.I.O., but within a day or two there was a swing back to the A.F. of L. union and that union *Page 517 
has ever since represented a large majority of the employees. All parties agree that the operations of the company are such that it is subject to the provisions of the National Labor Relations act. That act forbids it to negotiate with the C.I.O. union, inasmuch as a majority of the employees are represented by the complainant union. Virginian Railway Co. v. System Federation,300 U.S. 515; 57 S.Ct. 592.
As to the discharge of Melchionne. By the terms of the contract between the complainants, the company was in duty bound to discharge a workman who lost his membership in the union. Melchionne was active in leading employees into the C.I.O. union, and for this disloyalty to his own union, he was deprived of membership therein. While the cause of action by the union was ample, the procedure was insufficient. Melchionne was not advised of the charge against him or given any opportunity for defense. But the company cannot review the action of the union; it was justified in relying upon the statement of the responsible officers of the union. And certainly it cannot negotiate with the C.I.O. union concerning an employee's membership in the A.F. of L. union.
I have already mentioned the conference of representatives of the company and of the two unions with the Regional Director of the National Labor Relations Board a few days after the strike started, and the petition of the C.I.O. union to the board. Under the circumstances, there remained no further reasonable steps to be taken toward settling the dispute. Mays Fur, c., v. Bauer
(N.Y.), 26 N.E. Rep. 2d 279; Donnelly Garment Co. v.International Union, 99 Fed. Rep. 2d 309; Cater Con. Co.
v. Nischwitz, 111 Fed. Rep. 2d 971; National L.R.B. v.Sands, 306 U.S. 332; 59 S.Ct. 508.
I will advise an order continuing until final hearing the injunction heretofore granted and denying other interlocutory relief. Costs will be allowed complainants including stenographer's fee for the court's copy of the testimony and a counsel fee. The statute makes litigation of this kind very expensive. On the present application, the taking of testimony consumed a large part of four days. It seems to me *Page 518 
proper that defendants should assume a substantial part — though by no means all — of the complainants' expense. Counsel for complainants may prepare findings of fact in accordance with this opinion and may insert in it such other formal matters stated in the bill of complaint which he may deem advisable and which are not denied either by the answering affidavits or by the proofs taken in open court. The draft findings as well as the order should be submitted to opposing counsel for criticism before presentation to me.
The statute requires the complainant to give bond in favor of the defendants. Both complainants must join as obligors. Defendants urge that there should be a surety on the bond. The corresponding section of the Norris-LaGuardia Act which was the model for our statute, expressly requires security. Since our legislature omitted this provision, it falls within the discretion of the court whether or not to require security. In the present instance, the complainant company appears to be solvent and able to meet any liability on the bond, so no security will be required.
The amount of the bond is to be fixed by the court. It must be sufficient to secure to the defendants their court costs, attorney and counsel fees taxed against the complainant, in the event that the injunctive relief sought is subsequently denied by the court or in the event that the order granting injunctive relief is hereafter reversed on appeal. In fixing the amount of the bond, I have borne in mind that the usual security for costs is $150, R.S. 2:29-25, and $100 is the specified deposit on appeal. Errors and Appeals rule 24. On appeals from injunctive orders, the Court of Errors and Appeals has never allowed counsel fees. Nobile v. Bartletta, 112 N.J. Eq. 304. Whether that court will construe this statute as giving it implied power to allow counsel fees in such cases, I do not know. The amount of the bond will be $500.
Several serious questions were touched upon by counsel, but were not fully argued. I have expressly excluded them from consideration in this opinion. Are the amendments of the substantive law of contracts and of torts which are contained insection 1 of chapter 15 of the laws of 1941, void because *Page 519 
in contravention of the constitutional mandate that the object of every law shall be expressed in the title? Are the restrictions on the power of the Court of Chancery, which are found in the same section, unconstitutional? When the object of a strike and of picketing is unlawful at common law, may the court prohibit picketing and other strike activities despite the absence of violence?
If complainants, after further experience, find themselves substantially damaged by the picketing which the order permits, they may renew their application for a broader injunction and may then fully discuss the questions above stated.