These three cases are so similar, both in the facts and in the problems of law presented, that they can be disposed of *Page 5 
in a single opinion. The complainant Phelps Dodge Copper Products Corporation has a large plant in Elizabeth, with about 2,500 employees. The complainant Westinghouse Electric Corporation has two plants involved in the litigation; one in Newark where there are 2,500 employees, the other in Bloomfield with some 4,800 employees. The production workers of both complainants, members of United Electrical, Radio and Machine Workers of America, Local Unions Nos. 441, 426, 410 and 412, went out on strike in January, and the strikes still continue. No attempt has been made by complainants to replace the strikers or to continue production during the strikes. The tactics adopted by the strikers or their leaders at all three plants have been the same. Each striker was asked to devote an hour a day to picket duty. Pickets formed in front of each entrance of the plants in what has been called a circle but was really two lines of men and women walking in opposite directions on the sidewalk in front of the gate: the two lines, three or four feet apart, and each picket about three feet behind the one in front of him. Occasionally the pickets marched two abreast, making four lines. The number of pickets at each gate varied from a dozen to several hundred, according to the time of day and the importance of the gate.
The higher officers of the complainants at each plant and small selected groups of employees, such as powerhouse workers and watchmen, were permitted by the strikers to enter or leave the plants without difficulty. But when other non-striking employees, such as the secretarial force, draftsmen and supervisors, approached the gates, the pickets would draw together into a compact mass so that entrance into the plant became impossible, or at least hazardous. The technique of the pickets was not to use threats or violence but to establish a wall of human bodies. It is true there was some violence, but it was minor. Anyone desiring to enter had to try to shove his way through the pickets. They shoved back to prevent him from doing so. Intentionally or not, they trod on his feet, they elbowed him. But, as already indicated, the principal method used by the pickets in the accomplishment *Page 6 
of their purpose, was to mass themselves so closely together in front of the gate that no one could enter.
Complainants pray for injunctions in such terms as will restore access to their properties.
There is no right more essential or which we more rely upon in our daily living than the right to use the public streets and to enter wherever we are welcome. We count on it not only for our own free movement, but for others who may wish to come to us. The means taken to deprive one of this right are of little importance. What complainants are entitled to is free access to their plants as against any means and tactics whatsoever.
The defendants insist that whether or not their conduct would have been actionable or even indictable prior to March 13th, 1941, it is now lawful. To establish this position, they cite section 1 of "An act to limit and regulate the issuance of restraining orders and injunctions and regulating the punishment for violation thereof in disputes concerning terms or conditions of employment." P.L. 1941 p. 27. The section first forbids the issuance of an injunction prohibiting any of several specified acts, and among others, (e) giving publicity to the existence of a labor dispute by "picketing, without fraud or violence, or by any other method not involving fraud or violence, and not in violation of any other law of the State of New Jersey." The section concludes, "(k) The aforesaid acts are hereby declared, as a matter of public policy of the State of New Jersey, to be lawful and in nowise to constitute a tort or a nuisance."
The question now directly presented is whether the attempt of the legislature, by this statute, to make certain acts lawful, or non-actionable, contravenes that clause of article 4, section 7,paragraph 4, of our constitution which requires that the object of every statute shall be expressed in the title. The title must be so worded as to give information of the object of the statute to the legislators and to the public. This constitutional provision was meant to prevent concealment and surprise in legislation. Rader v. Union Township, 39 N.J. Law 509;Griffith v. Trenton, 76 N.J. Law 23; Hulme v. Trenton,95 N.J. Law 30; 96 N.J. Law 545; Kluczek v. *Page 7 State, 115 N.J. Law 105. Furthermore, the title is a limitation upon the extent to which effect can be given to the statute, for even though the principal object of the statute be expressed in the title, particular provisions which are beyond the scope of the title are void. Evernham v. Hulit, 45 N.J. Law 53; Jones
v. Morristown, 66 N.J. Law 488.
The title of the statute before me mentions only injunctions; it gives no notice that one of the objects of the act was to make certain acts "lawful and in nowise to constitute a tort or a nuisance," and that the statute in consequence takes away any right to an action at law for damages flowing from such acts. It is quite likely that if this feature of the bill had been brought to the attention of the legislature by a more revealing title, the provision would have been struck out before the bill was enacted into law. It seems clear that paragraph (k) of section 1, namely, the paragraph quoted above, is unconstitutional and void. Whatever acts were unlawful, or tortious, or a nuisance before the statute was adopted, are still so. The result I have reached is in harmony with what Mr. Justice Perskie said in Isolantite,Inc., v. United Electrical, c., Workers, 132 N.J. Eq. 613,
that the statute was designed merely to regulate procedure and to limit the scope of injunctive relief.
Defendants argue that even if it is unlawful for them to crowd so tightly around the plant entrances that no one can enter, and even though complainants have no adequate remedy at law, yet Chancery cannot intervene, or at most can enjoin only the use of "violence." This poses a second constitutional question, one which was mentioned in Isolantite v. United Electrical, c.,Workers, supra, but upon which the court found "no occasion on the record before us to express or intimate an opinion." We turn then to the first part of section 1 of the statute, that which forbids Chancery to issue injunctions in certain cases.
One of the famous passages of the Great Charter of Liberties that our ancestors wrung from King John is that whereby he covenanted "To no one will we sell, to no one will we deny or delay right or justice." Thus was recognized the duty of the state to provide a judicial remedy for the enforcement *Page 8 
of every right known to the law. Coke comments on this provision of the Great Charter: "And therefore, every subject of this realme, for injury done to him in bonis, terris, vel persona, by any other subject, be he ecclesiastically, or temporall, free, or bond, man, or woman, old, or young, or be he outlawed, excommunicated, or any other without exception, may take his remedy by the course of the law, and have justice and right for the injury done to him, freely without sale, fully without any deniall, and speedily without delay. * * * That by no meanes common right, or common law should be disturbed, or delayed, no though it be commanded under the great seale, or privie seale, order, writ, letters, message, or commandement whatsoever, either from the king, or any other; and that the justices shall proceede, as if no such writs, letters, order, message, or other commandement were to come to them." For, says Coke, "The law is the surest sanctuary that a man can take, and the strongest fortresse to protect the weakest of all." Coke's Inst., Part II,55.
The same duty of the state to enforce rights appears again in the maxim, Ubi jus ibi remedium. If the state fails in this fundamental duty, the individual who is wronged must depend on his own strong arm, and violence and anarchy are inevitable. But the people of New Jersey have not omitted to provide courts fully competent to administer justice. Nor did they commit our superior courts to the discretion of the legislature, for our Constitution of 1844 ordained and still ordains, "The several courts of law and equity, except as herein otherwise provided, shall continue with the like powers and jurisdiction as if this constitution had not been adopted." Article 10, section 1.
During the past century, there have been a number of instances in which the legislature has attempted to whittle away the jurisdiction of our constitutional courts — most frequently the jurisdiction of the Supreme Court on certiorari. I will cite only a few of our decisions in which the jurisdiction of our courts has been upheld against such statutes. The power of the Circuit Courts and of the Supreme Court to decide finally and without review whether a new trial should be granted: CentralRailroad Co. v. Tunison, 55 N.J. Law *Page 9 561; Flanigan v. Guggenheim Smelting Co., 63 N.J. Law 647.Certiorari: Traphagen v. West Hoboken Township,39 N.J. Law 232; 40 N.J. Law 193; East Orange v. Hussey, 70 N.J. Law 244.
Admissions to the bar: In re Branch, 70 N.J. Law 537. Function of the Supreme Court to "determine for ourselves upon all the evidence" the reasonableness of a rate fixed by the Public Utility Commission, despite restrictions imposed by statute:Public Service Gas Co. v. Board of Public UtilityCommissioners, 84 N.J. Law 463; 87 N.J. Law 581.
Judge Adams, in the Flanigan Case, summed up the matter for the Court of Errors and Appeals when he wrote that the provisions of our constitution "guarantee the integrity of the constitutional courts, of which the Supreme Court is one. Whatever powers that court had, whatever jurisdiction that court exercised, at the date of the adoption of the constitution, were by such adoption incorporated into the fundamental law and ensured against destruction or abridgment except through a change in the fundamental law itself. To abolish the court, to alter its organic character, to impair its jurisdiction, to diminish its authority, are beyond legislative power, because that character, jurisdiction and authority form part of a body of law which, upon wise grounds, has been made immutable by any mere legislative act."
Many of our cases speak of the right or prerogative of the court as the subject for protection. But the powers of the court are not secured against impairment for the sake of the court itself. A court is a mere agency of the people, established by them in their sovereign capacity for the service of litigants. Essentially the right which we must uphold is the right of the person who is wronged, or is threatened with wrong, his right to invoke the jurisdiction of the court. The statute now under consideration does not give him a new remedy for the old or provide a new forum instead of the old. It attempts to do away with the only sufficient judicial remedy for a certain class of wrongs and offers nothing in its place. The legislature cannot deny to the injured person right or justice by abridging the powers of one of our constitutional courts. *Page 10 
Of our constitutional courts, one of the most ancient and most essential in our system is the Court of Chancery. Vice-Chancellor Lane, in Allen v. Distilling Company of America, 87 N.J. Eq. 531
(at p. 543), well described its jurisdiction: "So long as courts of equity are to serve the purpose of the creation of the Court of Chancery of England — and in this state, the Court of Chancery is the successor, in all that such term implies, of that court — jurisdiction must depend only upon the existence of, or a threatened, wrong and the absence of an adequate remedy at law. * * * Due to our habit of endeavoring to find decided cases to fit each situation, we too often overlook the fundamental reasons for the creation or evolution of the court. It received no grant of express powers nor were express duties imposed upon it. The law courts were left to deal with the violation of all rights for which they could give an adequate remedy. The duty of relieving against any remaining wrongs was imposed upon the Court of Chancery."
If the courts of common law do not afford an adequate remedy to an injured person, he can demand relief in Chancery. The legislature cannot deprive him of his constitutional privilege to invoke its jurisdiction. The question goes to the root of the right of a free people to appeal to a constitutional tribunal ordained by themselves, and placed beyond impairment by legislative act. To such a question, there can be but one answer. The Court of Chancery must still determine the rights of the parties, and when the court finds that the complainant needs the protection of the court and is entitled to it by the established principles of equity jurisprudence, the court can and should come to his aid. The legislature cannot absolve the court from this duty, or impair the court's jurisdiction to perform it. Section 1 of the statute is unconstitutional.
The remainder of the statute is mainly procedural. Section 3 requires as a precedent to an injunction, the finding of certain facts by the court:
"(b) That substantial and irreparable injury to complainant's property will follow unless the relief is granted."
"(d) That complainant has no adequate remedy at law." *Page 11 
Defendants contend that relief must be denied because no tangible property is threatened with great damage which cannot be made good by money. These provisions are merely declaratory of principles which have always guided the court. "An injury is irreparable when it cannot be adequately compensated in damages or when there exists no certain pecuniary standard for the measurement of the damage. Inadequacy of damages as a compensation may be due to the nature of the injury itself or the nature of the right of property injured." Scharman v. Stern,93 N.J. Eq. 626. The word "substantial" is addressed to the discretion of the court; it means serious as opposed to trivial. This factor has always been a matter for consideration, especially in nuisance cases. Morris and Essex Railroad v.Prudden, 20 N.J. Eq. 530, 537; Master Weavers Inst. v.Associated Silk Workers, c., 116 N.J. Eq. 502. The term "property" is not confined to the tangible. A man's business, calling or profession is property. Barr v. Essex TradesCouncil, 53 N.J. Eq. 101; State v. Chapman, 69 N.J. Law 464;70 N.J. Law 339. In this statute, property embraces whatever is the subject of the protection of Chancery under our precedents.
A long line of cases establishes beyond argument that the blockading of a man's place of business works an irreparable injury, for which the law courts afford no adequate remedy and that he may come to Chancery for an injunction. See N.J. Atl.Dig., tit. "Injunctions," 101. Whether fraud or violence be used is immaterial. The erection of a brick wall would be equally objectionable, although nothing could be less fraudulent and less violent.
Of paragraph (c) of section 3 of our statute, I said inIsolantite, Inc., v. United Electrical, c., Workers, 130 N.J. Eq. 506,
that no effect could be given to it other than that the court should apply the doctrine of balancing the conveniences. On the appeal, no different opinion was intimated.
Section 4 reads: "No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation *Page 12 
or with the aid of any available governmental machinery of mediation or voluntary arbitration."
The defendants have shown that the complainants have failed to comply with certain orders or directives of the War Labor Board. The acts of that Board, which was abolished early this winter, were not reviewable or enforceable in any court; their character was advisory. Employers Group, c., v. N.W.L.B.,143 Fed. Rep. 2d 145; N.W.L.B. v. U.S. Gypsum Co., 145 Fed. Rep.
2d 97; N.W.L.B. v. Montgomery Ward Co., 144 Fed. Rep.
2d 528. A decision of the War Labor Board does not constitute an obligation imposed by law.
The defendants also urge that complainants have not made every reasonable effort to settle the dispute. Since the enactment of our statute, the United States Supreme Court, construing the corresponding provision of the Norris-LaGuardia Act, has overruled the prior decisions of the lower federal courts.Brotherhood, c., v. Toledo, c., Railroad Co., 321 U.S. 50;64 S.Ct. 413. The normal course in attempting to settle a labor dispute is described as first negotiation, then mediation, and lastly arbitration. While neither the employer nor the employees are under any legal obligation to negotiate, or to call in a mediator, or to submit to arbitration, yet if the employer fails to make every reasonable effort to settle the dispute by these methods, even if he declines to arbitrate, he cannot have an injunction from a federal court against the unlawful acts of the union. He still has an action for damages, but "the Congress, exercising its plenary control over the jurisdiction of the federal courts, has seen fit to withhold" the more efficacious equitable remedy. This construction cannot be applied to the New Jersey statute, because our legislature has no plenary control over the jurisdiction of Chancery and cannot make equitable relief contingent on the complainant's offer to substitute the will of an arbitrator for his own will in framing a contract to which he is a party. Undoubtedly, the legislature may regulate procedure, but it cannot prescribe rules of procedure which, in operation, deprive parties of their substantive rights, or impair the power of the court to perform its functions. *Page 13 
In the Isolantite Case, following the earlier federal decisions, I considered that the statute required no more than a reasonable effort to settle by any one of the three methods named. This I still take to be the proper construction of our statute. We say to the complainant, do not bother the court unnecessarily; talk over the matter first with your adversary and you may be able to reach an agreement.
But defendants assert complainants did not make a bona fide
effort to settle by negotiation, and offer as proof thereof that the complainants refused to yield to the union. It is the duty of an employer to confer, or offer to confer, with the representatives of the union; to listen attentively to what they have to say; to explain to them carefully his own position, and to reconsider that position in the light of all the facts and arguments presented by the union. The employer must be willing to continue this process as long as there is a prospect of a successful outcome, or until he finds himself driven to seek the aid of the court. An employer who has done this has made every reasonable attempt to settle the controversy by negotiation and has complied with the statute. Both the employer and the union are at liberty to remain obdurate and to refuse to yield to the other. Their so doing is not an indication of bad faith.
The contention of the defendants that a limitation of the number of pickets and forbidding the obstruction of access to complainants' properties, violates defendants' right of assemblage and free speech, is obviously unsound, and it was so held both in this court and on appeal in the Isolantite suit.
The defendants object to the procedure adopted in these cases. The Phelps Dodge bill of complaint was filed with Vice-Chancellor Stein Tuesday, January 29th, 1946, and an order to show cause advised by him returnable six days later, namely, on his motion day, Monday, February 4th. It embodied a restraint limiting the number of pickets and prohibiting interference with ingress or egress. The defendants object that the temporary restraining order contravenes section 3 of the statute which enacts that such an order "shall be effective for no longer than 5 days and at the expiration of said 5 days, shall become void." Time must be given *Page 14 
complainant for the service of the bill and order to show cause and a reasonable opportunity must be given to the defendants after service to prepare themselves for the hearing. Sunday is a holiday and Saturday a day whereon the Court of Chancery does not ordinarily sit. Other litigation in the court cannot be altogether ignored. A limitation as to time, such as is contained in this statute, has effect only to the extent that it is reasonable when applied to the facts of each case as it arises.Red Oaks, Inc., v. Dorez, Inc., 117 N.J. Law 280; Owens v.Atlantic City, 125 N.J. Law 145. In this instance, Vice-Chancellor Stein, as appears from the order which he advised, determined that the statutory limitation could not be given literal effect. The restraint continued in force in accordance with its terms until the return of the order to show cause and until the further order of this court.
The order also directed that the complainant "forthwith file with the court" the bond required by section 3 of the act. The section provides that no restraining order or injunction "shall be allowed except upon condition that complainant shall first file with the court" the bond. Defendants urge that it is not enough that complainant file a bond forthwith after the making of the order. Until complainant has made his application and the court has spoken, the complainant cannot know the amount of the bond or whether or not security will be required, and therefore he cannot prepare the bond in advance. It would be unjustifiable for the court, upon finding that immediate, substantial and irreparable injury is threatened, yet to withhold relief for a day or two while complainant procures and files the bond. The direction that the bond be filed forthwith was a sufficient compliance with the statute. The same provision with respect to the bond is found in other orders in all three cases and in each instance the bond was promptly filed.
The bill in the Westinghouse case which relates to the Newark plant, was filed with me Tuesday, January 29th, and the order to show cause was returnable a week later. It contained no interim restraint. The bill in the Bloomfield case was filed Thursday, January 31st, and an order to show cause advised by me returnable Wednesday, February 13th, containing *Page 15 
an interim restraint against hindering the entrance of fourteen powerhouse employees. If they had been kept out and steam had not been maintained, a destructive explosion might have occurred. The order expressly gave leave to the defendants to apply without notice Tuesday, February 5th, to vacate this minor restraint and leave to complainants to apply at the same time on two days' notice for an enlargement of the restraint. Both parties took advantage of the leave.
On the return day of the Phelps Dodge order, Monday, February 4th, Vice-Chancellor Stein was sick, so I hurriedly disposed of business which had been set for final hearing that day and undertook the Phelps Dodge matter. Complainant was given two hours, that is, until the midday recess, to present proofs, and the defendants, the rest of the day. The court offered to sit in the evening, but counsel for the defendants declined, quite properly, as the same counsel represented the defendants in all three of these cases as well as in other similar suits pending before other members of the court. So, at the close of the afternoon session, the hearing was continued to Wednesday, February 13th, the first day available. As the situation disclosed by the evidence taken on February 4th clearly required injunctive relief, I advised an order continuing the restraints until the conclusion of the hearing and the further order of the court. The defendants object that no restraint should have been imposed or continued until all the evidence was in. The fact that all evidence cannot be presented in a single day and that the hearing cannot continue on successive days, should not prejudice either party. There can be no doubt of the power of the court in the circumstances. It seemed discreet to exercise the power.
The procedure followed in the Westinghouse cases was similar to that which I have described. Presentation of proofs in the three cases occupied the court every day from Monday, February 4th, to Friday, February 15th, except one Thursday when defendants' counsel was otherwise engaged, and except Saturday, Sunday and Lincoln's Birthday.
The injunctions will be continued. *Page 16