59 N.J. Super. 240 (1960)
157 A.2d 542
UNITED STATES PIPE AND FOUNDRY COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY (BURLINGTON, NEW JERSEY, PLANT), PLAINTIFF-RESPONDENT,
v.
UNITED STEELWORKERS OF AMERICA, CIO-AFL, LOCAL NO. 2026, JOSEPH STELLA, STEPHEN COLE, JOHN LANKELIS, JAMES KENNEDY, HOWARD V. SMITH, ERNEST STERNOTTI, THEODORE DANIELS, LEON BORKOWSKI, ANTHONY CHRISTINZIE, ROBERT ADAMS AND JAMES SYKES, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1960.
Decided January 18, 1960.
*245 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. George Pellettieri argued the cause for defendants-appellants (Messrs. Pellettieri and Rabstein and Mr. Lewis C. Stanley, attorneys).
Mr. Harry Heher argued the cause for plaintiff-respondent (Messrs. Minton, Dinsmore and Bohlinger, Mr. H. Collin Minton, Jr., and Mr. George H. Bohlinger, Jr., attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
This is an appeal, taken by leave of this court, R.R. 2:2-3(a), from an interlocutory injunction granted by the Chancery Division on November 25, 1959 enjoining the defendant union and named individual officers and agents thereof, as well as "all persons and organizations associated with or acting in concert or combination *246 with them," from certain specified activities at or near the entrances to plaintiff's plant on East Pearl Street, in the City of Burlington, and regulating and restricting picketing by them related to an existing strike. The appeal was directed to be brought on for argument on an abbreviated time schedule. The nature of some of the questions raised by the parties and suggested by the court requires rather detailed recounting of the chronology of this controversy.
The defendant union represented about 670 of plaintiff's working force at its manufacturing plant; there were about 212 non-union employees. A three-year contract governing wages and working conditions of the union personnel expired August 20, 1959. Negotiations for a renewal not having resulted in agreement, the union called a strike and the union employees walked out at midnight of August 20, 1959 (Thursday-Friday). From that time until 10:30 A.M. Friday morning large numbers of the striking employees were massed at the main plant gates on East Pearl Street, resulting in practically total blockage of ingress or egress by vehicles and male pedestrians. Only women were allowed through. Later that day one of the Superior Court judges temporarily sitting to hear Chancery motions entered a temporary restraint and order to show cause based upon a verified complaint for injunctive relief against the activity described. The restraint was founded on oral proofs as well as affidavits and recited that it was issued without notice because "immediate substantial and irreparable injury" to plaintiff would probably otherwise result before notice could be served. See N.J.S. 2A:15-53 (Anti-Injunction Act, N.J.S. 2A:15-51 to 58, incl.).
The order to show cause was heard before another judge on August 26, 1959. The company proofs then adduced indicated that while there are in all six gates leading into the plant premises, only two are in regular use for plant personnel  Gate No. 1, customarily used by supervisory and office personnel, and Gate No. 2, for general plant employee use. Each is wide enough for two-way vehicular passage *247 (Gate No. 1 is wider), and each has separate pedestrian access gates alongside. In addition to proof of the mass obstruction in the early hours of August 21, 1959, plaintiff proved that during the remainder of that day and on Monday, August 24, 1959, the union carried on a practice variously described as "elliptical" picketing or "merry-go-rounding" at the vehicular gates. This consisted of pickets marching in an oval formation so as to prevent a vehicle from driving through the gates without risk of making contact with one of them. After one or more turns the line would open to let the car through. The result was, for example, that at closing times non-striking employees would be delayed anywhere from half a minute to 30 to 35 minutes in driving out of the plant. This activity terminated by Tuesday, August 25, 1959, and it was primarily on that basis that the judge denied the application for continuation of the preliminary relief, although finding that "there was illegal picketing in the early hours of this strike." The formal order provided that "plaintiff may apply for relief on short notice to the defendants or their counsel in the event of any further illegal acts of violence" and that costs should not be taxed in favor of defendants.
No union activity gave plaintiff any reason for further complaint to the court until Monday, September 14, 1959. A series of incidents from that morning until Wednesday morning, September 16, 1959, led plaintiff to give defendants' counsel short notice, at 10:00 A.M. that morning, by leave of the judge sitting in the Chancery Division vicinage for Burlington County, of an application to be made that afternoon, at 2:00 P.M. in Camden, for a new restraint based on such incidents. Union counsel appeared, stated the notice was insufficient to enable him to meet the application, and informed the court that the union's position was that it was and had continuously been doing only what the judge hearing the first show cause order had "instructed" it was permissible  "to stop cars and trucks going in there, not to compel them to stop, but if they stopped, to ask them to *248 respect the picket lines." He asked the court to set the matter down for full hearing the following week. Counsel for the plaintiff stated that it was willing to have the application considered as made "ex parte," with an order to show cause returnable on short date, but insisted on the right to an immediate temporary restraint on oral proofs it was ready to adduce. The court informed union counsel it saw no reason why it could not hear the application "in an ex parte way whether you received notice or didn't receive notice." The latter thereupon asked to be excused and left the courtroom. The plaintiff then adduced the testimony of F.W. Van Ness, assistant to the resident manager of the company, and of Newton Parks, works industrial engineer, establishing, mostly by their direct knowledge but partly by hearsay, several incidents of union picket activity from September 14 to September 16, producing obstruction of indeterminate duration of ingress and egress by trucks and a fairly continuous periodic obstruction of cars of non-striking personnel.
At the conclusion of the proofs the judge announced that plaintiff was entitled to a restraint: that there had been "adequate proof * * * of illegal acts by the defendants in the mass picketing and the inability of the proper flow of automobiles and trucks to the plant." An "injunctive order" was signed and served the same day reciting: "a. that illegal acts of further violence (sic) and unlawful acts have been committed by defendants, and are likely to be committed by them unless restrained," followed by the conclusions specified as prerequisites in b. and c. of N.J.S. 2A:15-53, in practically haec verba, but without the finding required by d. of that section "that plaintiff has no adequate remedy at law." Moreover, the bond for costs called for by the cited section was not ordered.
We refer at some length to the enjoining verbiage of the order as it remained in effect continuously thereafter until it was superseded by the interlocutory injunction of November 25, 1959, and we shall be considering the legal implications *249 of the subsistence of such restraints against the union all during the intervening period in the light of the various mandatory conditions specified as prerequisite for such relief in the Anti-Injunction Act. The union and the individual defendants were, in substance, enjoined from (a) collecting or gathering at the entrances of plaintiff's premises for the purposes of intimidating or coercing plaintiff's employees desiring to work, or other persons having business with plaintiff, or from preventing or obstructing anyone from entering or leaving the premises, except that six pickets ten feet apart might peaceably walk up and down the streets or sidewalks but not obstruct the entrances or molest or interfere with entry into or egress from the premises; (b) obstructing plaintiff's premises so as to prevent deliveries to or shipments from the plant of goods and merchandise; (c) "parading or patrolling, loitering or picketing about premises of plaintiff, or public streets or public sidewalks approaching thereto or in vicinity thereof except in such number or in such manner or in such places as hereinabove set forth in this order"; (d) directing, assisting or abetting any person in doing or attempting to do any of the foregoing prohibited acts; and (e) coercing employees of plaintiff by threats to them or their families to induce them not to report to work (no competent proof of any such threats by defendants had been submitted). There was absent from the order any finding of any specific acts committed by defendants and expressly complained of in the complaint (even as supplemented by the new application), as required by N.J.S. 2A:15-55.
The order set the matter down to be heard on the following Tuesday, September 22, 1959. (The statute provides that temporary restraining orders issued without notice become void after five days. N.J.S. 2A:15-53.) At the opening of the hearing on September 22, 1959, the court received in evidence over the objection of defendants the transcript of testimony taken on the return of the order to show cause concerning the August occurrences. Counsel for *250 defendants stated it was their position "that plaintiff be required to conform with all sections of the statute, N.J. (sic) 2A:15-51 to paragraph 58, inclusive, and to be made to prove all the elements set forth as prerequisites for relief in the statute * * *." The taking of proofs from both sides began and continued each successive court day (except Friday, September 25, 1959) through September 30, 1959. At that time the parties rested, and the court announced, on its own motion, and without objection of the parties, that it would continue the matter until October 7, 1959, the restraint to continue, and at that time hear oral argument on the application. Such argument was held, and, at its conclusion, the court stated it would make its "written finding of facts within the next few days with an opinion accompanying it," the existing restraints to continue in the meantime.
On November 17, 1959 the trial court filed a document entitled "Conclusions," in the form of an opinion. It was recited that the testimony showed that non-striking employees were partially operating the plaintiff's business and this entailed traffic in and out of the gates at morning, night and lunch-hour, as well as movement of goods by truck. The court found that the elliptical picketing, as described above, had occurred on September 14, 15 and 16, 1959, blocking vehicular plant traffic for "long and unreasonable delays" and that some vehicles were barred. It also found abusive language by some of the defendants "on more than one occasion" beyond the legal rights of reasoning with or solicitation of cooperation from employees or third persons. The deprivation of deliveries in and out of the plant and of free access thereto of employees "as well as the loss of the property rights of the plaintiff resulted in irreparable injury to plaintiff." It was concluded that the "recurrence" of the acts after the findings of the judge who sat on the August order to show cause and of further acts during the taking of the testimony on the current application showed "unlawful acts are likely to be continued unless restrained"; *251 also that this showed much greater injury would be inflicted upon plaintiff by a denial of the restraint than upon the defendant by its grant. The court found that both before and after expiration of the bargaining agreement representatives of the parties had met to attempt to resolve their differences. It said: "There was no evidence to indicate that the plaintiff failed to make every reasonable effort to settle such dispute, either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." The court rejected defendants' contentions that there was no blocking of traffic and that plaintiff itself "designed these stoppages," as unproved. It was directed that the restraint should be continued in the form of the September 16, 1959 order.
Defendants applied to this court for leave to appeal, with stay of the order pending appeal. This was denied as premature, no formal order having been entered. Thereafter, as noted, the interlocutory injunction now under appeal was entered November 25, 1959. This document recites the making of Findings of Facts, filed the same day, and the previous filing of Conclusions on "November 14, 1959" (actually filed November 17, 1959). The "Findings of Facts" makes the conclusionary recitals found in a. to d. of N.J.S. 2A:15-53, and that plaintiff has complied with the provisions of N.J.S. 2A:15-54 (compliance by plaintiff with obligations imposed by law and reasonable efforts to settle dispute). It then finds, in the same generalized language as was incorporated in the injunctive order of September 16, 1959, as described above, that defendants have (1) gathered to coerce or intimidate, and obstructed plaintiff's employees and others having business with plaintiff from ingress and egress to and from its plant; picketed to effect such obstruction; obstructed deliveries and shipments of goods; and aided and abetted others in doing such acts. The interlocutory injunction of November 25, 1959 repeated the restraints of the injunctive order of September 16, 1959 except that against coercion of non-striking employees by threats of *252 violence, which was concededly not supported by the proofs. Also, and for the first time, plaintiff was ordered to file a bond "pursuant to N.J.S. 2A:15-53" to secure defendants' costs and counsel fees "in the event that the injunctive relief herein granted is hereinafter reversed by the Appellate Court."
On granting leave to appeal, this court, by divided vote, denied a stay of the injunction pending appeal.

I.
We first address our attention to the defendants' contention that the evidence does not show them to have been guilty of conduct fairly beyond the lawful scope of the economic and psychological pressure which a striking union may apply in the effort to win a strike. Preliminarily, we note we have no concern here with the doctrinal vagaries as to the effect of the legality of the ultimate purpose and object of the picketing as neutralizing its "free speech" constitutional aspect. See the discussion of this subject in Independent Dairy Workers, etc., v. Milk Drivers, etc., Local No. 680, 30 N.J. 173, 183-184 (1959); Galler v. Slurzberg, 27 N.J. Super. 139, 154-157 (App. Div. 1953), certif. denied 13 N.J. 391 (1953). The rise and fall of the so-called Thornhill doctrine (equating picketing with the right of free speech) in the United States Supreme Court is reviewed in International Brotherhood, etc., v. Vogt, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957). The present problem, by contrast, is simply whether the picketing here was beyond the "peaceful" category and invaded the property rights of the plaintiff to an extent appropriately calling for equitable relief by injunction. Here, the object of the strike and picketing  as implements of economic pressure to obtain a better collective employment contract from the strikers' employer  was clearly lawful. What is in issue is the manner of the picketing. While striking picketers unquestionably have the right to attempt to dissuade *253 non-striking employees and business visitors from crossing the picket line, this does not extend to the privilege of harassment of the individuals involved or substantially impeding free ingress and egress to and from the employer's premises. Under the rationale of the controlling decisions of our court of last resort in such cases as Westinghouse Electric Corp. v. United Electrical, etc., 139 N.J. Eq. 97 (E. & A. 1946), and Isolantite, Inc., v. United Electrical, etc., of America, 132 N.J. Eq. 613 (E. & A. 1942), absence of violence is not the sole requirement to render "peaceful picketing" immune from judicial restraint. "* * * [I]t must be free from intimidation, coercion, duress, fraud and force," Westinghouse Electric Corp., supra (139 N.J. Eq., at page 112), and is illegal and enjoinable if it deprives the employer of "the right of free access to [its] plant by the owners thereof and their employees and customers who wish to enter same." To the extent that such free access is denied, the union's activity is an illegal seizure of the employer's property. Id., at page 113. As liberal a judge as Mr. Justice Reed, dissenting from the Supreme Court's holding in Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, at pages 738-739, 62 S.Ct. 807, 815, 86 L.Ed. 1143 (1942), that Texas might constitutionally enjoin union picketing for a purpose conflicting with state policy, nevertheless said: "We do not doubt the right of the state to impose not only some but many restrictions upon peaceful picketing. Reasonable numbers, quietness, truthful placards, open ingress and egress, suitable hours or other proper limitations, not destructive of the right to tell of labor difficulties, may be required." (Emphasis added)
The age of the decision does not detract from the continued authority of Keuffel & Esser v. International Ass'n. Machinists, 93 N.J. Eq. 429, 431 (E. & A. 1922), following American Steel Foundries v. Tri-City C.T. Council, 257 U.S. 184, 203, 204, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (a case in which Chief Justice Taft spoke for a court inclusive of Justices Holmes and Brandeis), to the effect that *254 "men may accost one another with a view of influencing action, but may not resort to persistent importunity, following and dogging." (But "following" solely to communicate one's views may not necessarily be unlawful. Isolantite, Inc., v. United Electrical, etc., of America, supra (132 N.J. Eq., at p. 623).) Further, "the employer ha[s] the right to the access of his employees to his place of business and egress therefrom without intimidation or obstruction," while strikers have "the right to use peaceable and lawful means to induce * * * employees * * * to join their ranks." Keuffel & Esser, supra, 93 N.J. Eq., at pp. 430, 431. And see Bayonne Textile Corp. v. American, etc., Silk Workers, 116 N.J. Eq. 146, 163 (E. & A. 1934).
It has been held that, substantively, nothing in the Anti-Injunction Act (cited above) operates to validate or withdraw from the remedial process of injunction what was previously acknowledged as tortious conduct injurious to property rights. Westinghouse Electric Corp., supra (139 N.J. Eq., at p. 108); Independent Dairy Workers, etc., supra (30 N.J., at page 186). Undoubtedly the express legislative declaration of policy as to valid labor practices, including strikes and picketing, in the act cited, N.J.S. 2A:15-51, was designed to remind our equity courts thereof in the context of a statute conceived, over-all, to remedy the abuse of hasty, ill-considered and unfair injunctions in labor disputes, but the essential scheme of the act, as we shall see hereinafter, was to attain its objectives by imposing procedural safeguards against oppressive and unjust injunctions in such cases.
Defendants stress that their stopping of cars and trucks was only incidental to a reasonable exercise of the right to persuade the drivers thereof to cooperate with their strike objectives, and not of a degree substantially beyond the fair purview of that right. They contend that supervisory employees and officers of plaintiff adopted tactics designed to aggravate the stoppages in order to promote the chances of obtaining an injunction  not to protect its property or maintain *255 its activities, which were not being substantially impaired or curtailed  but to "break the strike." This argument makes it necessary to look at the factual picture painted by the proofs  a process which will also serve the occasion later herein to appraise the sufficiency of the findings of fact and conclusions.
A fair analysis of the proofs reveals the following. Prior to Monday, September 14, 1959, according to Ernest A. Sternotti, International Representative of the union, and in charge of negotiations and strike activities for the local, an "agreement" had existed, arranged between union counsel and the employer's, whereby the union would "allow" passage of company trucks and rail shipments. On that morning the union received information that the employer was using leased carriers for the shipment of its products out of the plant. This was objectionable to the union. It had previously been successful in getting drivers delivering to the plant to "respect" its picket line. The plaintiff anticipated trouble on that date, there having been warnings by one Borkowsky, a striker, to Parks, the works engineer, in the presence of a non-striking secretary, and to a company supervisor, one Durham (all three testifying thereto), that starting the following week, "no women will get through." The supervisors were instructed by plaintiff on Friday, September 11 to be on hand early Monday morning with photographic equipment.
Basically, the acts complained of here are the union's blockage of automobiles driven by non-striking employees as well as truck traffic coming into and out of Gates No. 1 and No. 2. (The other four gates into the plant were not opened during the strike. But they had not previously been used for general access purposes by supervisory or office personnel.) It is clear that there was no attempt by the union at any time to block or hinder pedestrian flow in and out of the gates, or, for that matter, to accost pedestrians with a plea to stay out. Stella, the union president, testified that he gave the strikers instructions not to hinder vehicular *256 traffic as well, but it is obvious that there was some degree of planned union hindrance thereof.
On Monday, September 14, there was no obstructive picketing activity until 10:30 A.M. Before that time management employees came and went freely, and a loaded leased truck was driven out Gate No. 2 twice by Griffith, a foreman. Sternotti and Stella heard about the use of the leased truck and went to the gate, with an added complement of picketers. They arrived just in time to see a station wagon, which was escorting the truck, come through the gate. Van Ness, who drove the station wagon, testified that as he neared the gate, there were eight or ten pickets circling at the gate, forcing him to stop and then inch his way through. Sternotti and Stella claim the station wagon did not stop at all. The truck, however, did stop at the gate  the pickets had commenced marching about in elliptical fashion, the testimony numbering them between eight and twelve. Sternotti spoke to Griffith, the driver, for several minutes and then to the cab passenger, Scudder, a production manager. He crossed the line, spoke to the occupants of the station wagon, Van Ness; Bowker, of management; and Burr, an engineer, and then returned to speak with Griffith. At that point, about ten or fifteen minutes after the truck first stopped, Burr went back through the line and instructed Griffith to return the truck to the plant grounds, which he did. During this time photographs and movies of the pickets were taken by Burr, Bowker and Parks, who was in a second station wagon behind the truck. Some of these were introduced in evidence and show the pickets standing facing the truck while Sternotti is addressing the driver. Parks also testified that he was called a foul name by one of the pickets, whom he identified. This was denied. Sternotti's explanation of the various conversations was that he did not realize that the driver was a company supervisor and was trying to persuade him to respect the picket line. Scudder agrees that Sternotti used no threats or foul language, nor shouted. The supervisors' testimony purports to refute the claim that *257 the only purpose of the blockage was persuasion. They are agreed as to various statements made by Sternotti, such as, "You should feel proud of yourself," "Doesn't your conscience bother you?" and, "I didn't know a snake could sink so low."
After the truck turned back, Van Ness drove the station wagon back into the plant grounds without incident and returned to his office to review the matter and to consult with counsel over the sufficiency of this episode as a basis for an injunction. Griffith was instructed at 1:30 P.M. to take the truck out again and did so without any difficulty.
This truck incident was the only untoward happening on Monday, September 14, 1959. Viewed most favorably to the contentions of the plaintiff, Van Ness acted reasonably in deciding that the truck would not get through at that time and instructing it to retreat. However, Van Ness' motive is suspect, as events indicate he was looking for evidence to support an injunction. Moreover, the substantiality of the episode seems diminished by the fact, if true, that the sole cause of the stoppage was Sternotti's lawful desire to persuade an "outside" trucker to respect the lines. Note that Griffith during that week took out thirteen additional truckloads without appreciable incident.
On the morning of Tuesday, September 15, the union applied the elliptical picketing technique to all non-striking employees arriving by car. The pickets would make one to four circles in front of the gate, disperse enough to let one car through, then repeat the process before letting the next one through, and so on with all in line. This was the same general tactic that had been used on the second working day of the strike, Monday, August 24, but was thereafter generally abandoned, occurring only sporadically up to September 15. Although Walker, Van Ness and Ireton, a production manager, were held up for two or three minutes at Gate No. 1, the "merry-go-rounding" at that gate was not continuous, Bowker passing through with no obstruction. At Gate No. 2 each driver was "merry-go-rounded" for about *258 three minutes while Sternotti attempted to persuade him not to enter the plant. There is no doubt that this form of picketing was intended to block access temporarily by each car, and actually did. The testimony of one Stuart before the judge who heard the August application for restraint indicates the efficacy of the technique and the foolhardiness of disregarding it.
"I proceeded very slowly, I would judge the maximum of half a mile an hour in a very halting way. At one stage of the game I thought my line had opened up. They passed by me a couple of times but it closed up again and one of the voices on the line shouted that I hit him. I felt no impact or could not have because I was moving very, very slowly. They shouted, `Take his number.'"
At any rate, we are clear that a non-striking driver does not have to subject himself to the risk of trying to drive through such a line. As to the intent to block to the extent of exercising dominion over the gate, this is plainly inferable from the continual references by Sternotti, Stella and counsel to "allowing" the cars through and "letting them through."
There was nothing else untoward on Tuesday. Griffith took out four truckloads of merchandise with no blockage.
On Wednesday, September 16, the tempo of union blockage of non-striking employees' vehicles increased, and the plaintiff deliberately made a bad situation worse. That morning some of the supervisors, most of whom customarily used Gate No. 1, drove up to Gate No. 2. Shortly before 8:00 A.M., Wilson, a supervisor, drove up to the gate from one direction, the pickets were circling, and he stopped. Sternotti went over and asked him "to respect the picket line." Parker, another supervisor, drove up from the other direction, and also stopped. Manning, also a supervisor, pulled up behind Parker, his car blocking traffic from both directions. Griffith came into position behind Manning and was told by another supervisor, Downs, to "pull up tight." By about 8:45 A.M. no car had entered the gate, and one Anderson, a night watchman, who had been waiting *259 to drive out of the plant since 8:00 A.M., was still on the other side of the gate. There were about 70 cars lined up in the easterly direction and about 25 in the westerly, including two school buses and a mail truck.
About this time Marie Sozio, a company stenographer, drove to the gate by coming down the left lane of the street and pulled up between Wilson and Parker. She testified that she had expected to be allowed through, because, up to that time, the women had not been stopped. She testified:
"The next thing that happened, Mr. Sternotti came over to my car and his words to me were  `We won't let you in with the car; you can walk in, but can't get in by car.' He said, `Leave it here.' I said, `I am afraid to leave it here. I am afraid they might slash the tires, or let the air out, if I left it here.' So, he said, "It is up to you, but you are not going in with the car.'
So, at this point I backed up my car and tried to get out from west to east on Pearl Street, and I could not fit. So, I backed my car down this way and went towards Florence and went home."
Her husband drove her back to work, and she then walked through the gate. Sternotti's version of the same episode was this:
"A. Well, then a car pulls up on the outside and comes up to the picket line and stops. In that car was Marie Sozio and she stood there for about five minutes. After a while I recognized it was Marie and I went over and I talked to her. I said, `Marie, why don't you park your car and go on in?' She said, `You mean that I am free to go into the plant?' I said, `Sure, you are free to go into the plant.' She said, `Where will I park my car?' I said, `You can park your car anywhere across the street.' She said to me, `I will probably get killed if I do that.' I said, `Well, Marie, that is up to you.' * * *."
Griffith by this time had left the line and returned home. He said he made no further attempt to enter the plant because of threats from one of the Sykes twins, striking pickets, both of whom testified in denial.
Before 9:00 A.M. the local police chief arrived, was told by Sternotti that the union was not responsible for the traffic tie-up, and that his men were not stopping the cars from going through, but that they were making no attempt to *260 do so. The extent of the chief's efforts was to clear the tie-up, but not by requiring the pickets to allow the cars to drive through into the plant grounds. It is clearly inferable that Sternotti dissuaded him from doing so. The chief first moved the pickets back somewhat so that Manning could leave the line, thereby making a passageway for the mail truck. He then directed the supervisors to park their cars on the side of the road. By 9:15 A.M. traffic had cleared and most of the supervisors walked into the plant, leaving two or three to guard the cars. But no car had driven through Gate No. 2, although Anderson had driven out.
The union testimony purported to establish that the Gate No. 2 incident was completely the fault of the company. Sternotti testified that he asked Parker to enter the plant but that he said he would not because he was following orders. One of the Sykes brothers testified to a similar conversation with Manning. Sternotti's testimony was not directly denied, but Sykes' was, on recall of Manning. Parks admitted telling several of the supervisors who wanted to use Gate No. 5 (between No. 1 and No. 2, and leading into a general employee parking lot, but not directly into the plant) not to use it. We are satisfied the evidence requires the conclusion that the company was as much responsible for the extent of the street traffic jam at Gate No. 2 as the pickets, although the activity of the latter set the events in train.
There was also the typical elliptical obstructive picketing of employee vehicles at Gate No. 1 on Wednesday morning, even as to supervisors whom the pickets knew they could not expect to persuade to stay out. A South Carolina customer's truck turned back from Gate No. 1 after picketing remonstrances and a request from police that it stop blocking the road. There is sharp conflict as to the extent of its physical obstruction. It returned the next day, after the restraint had issued, and effected entrance.
On Wednesday at 1:00 P.M., when Van Ness arrived with company counsel to pick up Parks for their scheduled court *261 appearance at 2:00 P.M., the elliptical picketing prevented his entrance at Gate No. 1. There is testimony on behalf of plaintiff that cars of employees wishing to drive to lunch were parked at the gate, blocked by the pickets. But this blockage was obviously aggravated by company tactics. The occupant of the first car in line, a supervisor, had gone back to his office and left the vehicle standing there. When one of the women employees got out of the stalled line to go through the line of pickets (and there is credible evidence that the circling pickets were willing to let cars through periodically), she was instructed by a management employee to get back into the single-file line, and did so. She eventually drove out. The pattern here was like that of the morning at Gate No. 2  temporary, periodic nuisance-obstruction by the pickets, but exacerbated by management strategy, obviously to strengthen the case for an injunction.
Considerable union blockage took place at Gate No. 1 when the working employees sought to leave on Wednesday afternoon at about 5:00 P.M. (at about the time the restraint was being signed). While cross-examination of Walker indicates some basis to suspect the company was not eager to mitigate the difficulty, there nevertheless is convincing testimony, undenied, that the line of cars was held up by the pickets and not allowed to leave except at 15 to 20 or more minute intervals. Some of the cars had not left by 8:00 P.M., when the police arrived and opened the line. The restraint was served on the union at 7:00 P.M.
There was evidence of scattered elliptical picketing on Thursday, September 17, and of an apparent effort by a management man, Ireton, to contrive a traffic blockage incident like that of Wednesday morning. Griffith drove out five truckloads of merchandise but was held up a half hour by the pickets on one occasion. A rock was thrown at Parks, the thrower unidentified. Friday, September 18, was almost without incident.
Calm prevailed thereafter until the afternoon of September 23, 1959. The cars leaving through Gate No. 2 after *262 5:00 P.M. were blocked for 10 or 15 minutes while the occupants of some of them were subjected to insults and threats couched in foul language by one or more of three specified strikers, apparently semi-intoxicated. The defendants offered persuasive testimony that these men had not been assigned to picket duty but were unauthorized interlopers. The proof was that they arrived at the gate intoxicated and took control from the pickets assigned thereto. The incident was isolated and not reflective of a likelihood of recurrence.
It should be obvious from the foregoing that the general character of the union picketing activity transcended what is permissible as a matter of lawful strike conduct. Some of the obstruction of vehicles was fairly incidental to legitimate persuasion to gain allies. Much was obstructive purely for the sake of coercive harassment. There was a denial to the plaintiff of free and unimpeded access to and egress from its plant by its employees and business visitors of a character which sufficiently educes the presumption of irreparable injury and inadequate remedy at law, within the rationale of the application of the equitable remedy by the cited decisions of our courts of last resort and without impingement upon the public policy of the Anti-Injunction Act.
Whether the violation of plaintiff's property rights was substantial and likely of continuance unless restrained, as is required under N.J.S. 2A:15-53, as of the time the plaintiff gave notice of renewed application for restraint on the morning of September 16, is fairly questionable. But any doubt as to these factors is dispelled, in our judgment, by the added weight of the objectionable union activities which transpired during the remainder of that day and thereafter.
The determinative consideration is that the fair weight of the credible evidence plainly justifies a conclusion of purposeful harassment of the company's business operations by obstruction, sometimes total and sometimes partial, of plaintiff's employees' and business visitors' vehicles. The Sternotti-Sozio incident, as well as other proofs, gives strong *263 color to the company's contention that the picketing activity had more than legitimate persuasion in view and was intentionally obstructive of ingress and egress to and from the plant. These basic facts retain their significance despite the company's aggravation of the situation. There was established a definite, repetitive pattern of continuous and unlawful dominion over and obstruction of the company's gates, of a kind historically evocative of the protective decree of Chancery to restrain continuous trespasses. 4 Pomeroy's Equity Jurisprudence (5th ed. 1941), § 1357, pp. 964-966; see McCullough v. Hartpence, 141 N.J. Eq. 499 (Ch. 1948); Loeser v. Wosnitzer, 105 N.J. Eq. 460, 461 (Ch. 1930).
We conclude that defendants' behavior, on the totality of the proofs, was such as to have afforded a substantive basis for injunctive relief.
While the predilection of the company to magnify its case, and thereby perhaps to provoke a worsening of the strike atmosphere, by the conduct we have mentioned, was regrettable, we have chosen not to decide whether it amounts to the kind and degree of provocation which dictated denial of injunctive relief by Judge (now Mr. Justice) Schettino in Westinghouse Elec. Corp. v. Local No. 449, etc., C.I.O., 39 N.J. Super. 438 (Ch. Div. 1956), affirmed and modified in respect to other matters 23 N.J. 170 (1957), as we have concluded that the injunction must be reversed for serious nonconformance with procedural requirements of the Anti-Injunction Act. (See III, infra.)

II.
The defendants have made a special point of the alleged impropriety of the injunction because of the argued failure of plaintiff to have recourse to local police authorities and the failure of the court to find that those agencies were unequal to the protection of plaintiff's property rights without the need for recourse to an equity court for an injunction.
*264 Section 7 of the Norris-La Guardia Act, 29 U.S.C.A. § 107, adopted in 1932, after which N.J.S. 2A:15-53 of our own Anti-Injunction Act, adopted in 1941, is closely patterned, includes among the facts which must be expressly found by the court as prerequisites to injunctive relief in labor dispute cases: "(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." But N.J.S. 2A:15-53 conspicuously omits that provision. Yet defendants argue its substance was nevertheless intended to be included within the requirement that it be found, "d. That plaintiff has no adequate remedy at law," notwithstanding the latter provision was copied verbatim from section 7 of the federal act. The position taken is clearly unwarranted. Not only is it refuted by the otherwise unexplained omission of provision (e) of the federal section from the New Jersey statute, but the phrase "adequate remedy at law" is a legal term of art having a settled and well-known meaning in equity jurisprudence as referable to the remedy for damages in a civil court. 1 Pomeroy, op. cit., supra, § 221a., p. 377.
Moreover, it is plain from our reading of the transcript of evidence that plaintiff did summon the local police, or they arrived on their own volition, on several occasions during the more disorderly phases of the picketing. Yet the police were generally at pains to restrict their activity to clearing the streets for general traffic. For example, the chief of police studiously avoided directing the first cars in line through the company gate during the morning traffic jam on September 16, 1959 notwithstanding that was the most obvious way of relieving the situation and at the same time giving the non-striking supervisors the unobstructed ingress into the plant plaintiff was entitled to have them accorded.

III.
Substantial failure in the Chancery Division proceedings of compliance with several mandatory conditions precedent *265 specified for the grant of injunctive relief of any kind in labor disputes by the Anti-Injunction Act constrains us to the conclusion that the defendant union was thereby so clearly subjected to unlawful restraint during a crucial period of the strike that due regard for the objects and purposes of that act requires reversal of the injunction under appeal.
Most disturbing is the fact that the trial of the issues, from September 22 to September 30, did not eventuate in any kind of findings thereon until November 17, 1959, or in any formal adjudicatory order until November 25, 1959, during the entirety of which period the striking union remained under the burden of the September 16 injunction  and that unattended by proper findings of fact and broader than required to protect plaintiff's rights. While we mean no reflection whatever on the able and conscientious Chancery Division judge, charged as he was during that period with other heavy administrative and judicial duties (including a temporary Appellate Division assignment), the intent and purpose of the statute compel appellate nullification of such a result, to the limited extent that such an adjudication at this late date can be at all remedial.
A review of the presently material provisions of the statute will give point to our observations. Section 51 (we refer to the section of N.J.S. Title 2A, Chapter 15 (Article 8), deriving from L. 1941, c. 15) directs that "no court" or "judge" shall issue "any restraining order or interlocutory or permanent injunction" to restrain the doing of ten categories of acts in relation to labor organization or labor activity, including striking or picketing, all declared to be lawful as a matter of public policy. Section 52 contains explanatory and interpretive delineation of the policy underlying the act, including the fact that the status quo in a labor dispute (strike) cannot be maintained but is necessarily altered by an injunction, error in issuing the injunction is usually irreparable to a union, and delay incident to the appellate process frequently makes correction of trial level error unavailing. Section 53 forbids the issuance of injunctions in *266 labor disputes except upon testimony in open court, on notice (except where substantial and irreparable injury otherwise threatens), "and except after findings of all the following facts by the court," including, in substance: (a) unlawful acts have been committed and are likely to continue if not restrained; (b) substantial and irreparable injury to plaintiff's property will follow if not restrained; (c) as to each item of relief greater injury will fall on plaintiff without injunction than upon defendant if granted; (d) plaintiff has no adequate remedy at law. A restraint issuing without notice must be based on the same testimonial showing as specified for restraints with notice and becomes "void" at the expiration of five days. The issuance of any restraint, even a temporary restraining order, must be preceded by the filing of a bond to secure the defendant its costs and counsel fees in the event of subsequent denial or reversal of the restraint. The provisions as to findings of fact in Section 53 are in pari materia with Section 55, which precludes the issuance of any "restraining order or interlocutory or permanent injunction" in such a case "except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance" of the restraint. Every such restraint or injunction "shall include only a prohibition of such specific act or acts as may be expressly complained of in the complaint * * * and as shall be expressly included in said findings of fact * * *." (Emphasis added)
The mandatory intent of the requirements detailed is obvious from the statutory language, most of it taken verbatim from the Norris-La Guardia Act. In Westinghouse Electric Corp., supra, the Court of Errors and Appeals stated that "what the legislature intended and aimed to accomplish was to protect and safeguard the employee against the prevailing procedure theretofore employed in obtaining and issuing restraints and injunctions * * *" (139 N.J. Eq., at p. 110) and that the act was designed for "the procedure which must be followed to obtain the injunctive *267 relief and to limit the scope of the relief granted," id., at page 111 (emphasis added). A dispute as to the lawfulness of the picketing cannot "justify a disregard of those provisions." See Ind. Dairy Workers, etc., v. Milk Drivers, etc., Local No. 680, supra (30 N.J., at page 185). As was logically stated by the New York Court of Appeals in relation to its anti-injunction act, comparable to ours:
"The need for statutory safeguards can exist only where a defendant is guilty of some wrongdoing and is liable to injunctive restraint. The effect of the statute is to regulate the procedure by which an injunction may be obtained and to limit the scope of the relief which may be granted. The statute is rendered meaningless unless it is allowed to operate in those cases where plaintiff is entitled to some relief." May's Furs and Ready to Wear v. Bauer, 282 N.Y. 331, 26 N.E.2d 279, 284 (Ct. App. 1940).
The long history of judicial hostility to the collective power of union labor in this country well beyond the first quarter of this century and its manifestation in the ready use of the injunction in curbing strikes are too well known to require extended recounting. See Frankfurter and Greene, The Labor Injunction (1930), passim; Gregory, Labor and the Law (2d ed. 1958), Ch. 4, p. 83 et seq.; Ch. 7, p. 158 et seq. See also Milk Wagon Drivers Union v. Lake Valley Farm Products, 311 U.S. 91, 102, 61 S.Ct. 122, 85 L.Ed. 63 (1940). An earlier legislative attempt to palliate this problem in this State (L. 1926, c. 207) had only limited judicial cognizance. See Gevas v. Greek Restaurant Workers' Club, 99 N.J. Eq. 770, 787 (Ch. 1926). A long legislative campaign preceded the success of the forces friendly to labor in New Jersey in the adoption of the Anti-Injunction Act in 1941. (S-161, 1930; S-131, 1931; S-11, 1932; A-195, 1932; A-105, 1933; A-175, 1934; A-287, 1934; A-176, 1935; A-108, 1936; A-300, 1937; A-27, 1938; A-6 and A-53, 1939; A-41 and A-215, 1940; S-39, 1941, which was enacted as L. 1941, c. 15.) Efforts to accomplish such relief through amendment of the rules of the Court of Chancery were substantially fruitless. See Chancery Docket *268 112/363, containing a petition on behalf of the New Jersey State Federation of Labor praying amendments comparable with the Norris-La Guardia Act and "Conclusions" by the Chancellor denying the petition, filed January 20, 1936. By amendment of March 1, 1938, Chancery Rule 212 provided for ad interim restraints (in causes generally) only on two days' notice, unless the court found from the affidavits substantial and irreparable harm. The public importance attributed to the adoption of the Anti-Injunction Act is apparent from the front-page report in The Newark Evening News, March 11, 1941.
If there was one consideration that was paramount in the presumed legislative intent in enacting the Anti-Injunction Act, it was that the mere issuance of an injunction in the early phases of a strike could critically sway the balance of the economic struggle against the union and that it was therefore imperative that injunctions not issue in the first instance unless preceded by all the procedural safeguards embodied in the statute, or be allowed to continue when issued provisionally longer than the minimum reasonable time for hearing and specifically determining the existence of the statutory criteria. Frankfurter and Greene, op. cit., supra, pp. 222-223, referring to "the irretrievable damage to a strike that later reversal or modification of an injunction cannot ameliorate," and initial restraining orders "kept alive for weeks or months" under former federal practice "for good cause shown," 38 Stat. 737 (1914) (Clayton Act, Section 17[*]); Gregory, op. cit., supra, pp. 99-100; Seidenberg, "The Labor Injunction in New York City, 1935-1950," Vol. IV, Cornell Studies in Industrial and Labor Relations (1953), p. 12.
But these purposes and objectives of the act are likely to be overlooked in its application against the background of a specific case where the evidence shows illegality in picketing activities. They must not be. As in the case *269 of enforcement of the constitutional guarantees of the Bill of Rights, the viability of the protective statute depends upon its faithful judicial application in hard as well as easy cases.
The application for the September 16, 1959 restraint was, technically, on notice, and the five-day limitation provision of Section 53 therefore not strictly applicable. The court and the parties, however, as noted above, expressly treated it as though it were ex parte. So considered, the restraint would under the statute have become void after five days, and required further hearings, on notice, and the making of the statutory findings, etc., before renewal. In any view, however, the restraint was provisional, gave the defendants notice of plenary hearings to begin September 22, 1959, and should have been retained no longer than was necessary to develop the facts as to illegality of the picketing and the other statutory criteria on the hearings and make appropriate findings, pro or contra, forthwith. See Toledo P. & W.R.R. v. Brotherhood of R.R. Trainmen, etc., 132 F.2d 265 (7 Cir. 1942), reversed on other grounds 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1955); cf. Thayer Co. v. Binnall, 326 Mass. 467, 95 N.E.2d 193 (Sup. Jud. Ct., 1950). Here the restraint remained in effect almost six weeks after the conclusion of the hearings before findings of any kind were made, and almost two months before the injunction was entered on the findings. The harm in such a course, as defendants rightly stress, is brought home by contemplation of the resulting injustice were the court ultimately to conclude that no case for restraint had been made out. Moreover, notwithstanding Section 53, the requisite bond for costs was not actually filed until December 5, 1959, and this as against the subsistence since September 16 of a restraint which the statute mandatorily required to have been preceded by its filing. Nor was a bond ordered to be filed prior to the provision therefor in the interlocutory injunction of November 25, 1959 (which set no time for its filing).
*270 It is evident that the procedural requirements of the statute are more prophylactic than therapeutic in design. Unless the appellate sanction for their violation is consistently imposed without regard to the merits of the claim for injunctive relief, their mandatory voice is muted and their function as a brake upon the ill-considered issuance of strike case injunctions weakened. The cases applying the Norris-La Guardia Act and its state legislative counterparts regularly invalidate injunctions granted without compliance with the statutory prerequisites, and without regard to the unlawfulness of the conduct complained of. Lauf v. E.G. Shinner & Co., 303 U.S. 323, 329, 58 S.Ct. 578, 82 L.Ed. 872 (1938); Green v. Obergfell, 73 App. D.C. 298, 121 F.2d 46, 53, 138 A.L.R. 258 (D.C. Cir. 1941); Donnelly Garment Co. v. Dubinsky, 154 F.2d 38, 45 (8 Cir. 1946); Blackburn v. Koehler, 127 Ind. App. 397, 140 N.E.2d 763, 766 (App. Ct. 1957); Poirier v. Superior Court, 337 Mass. 522, 150 N.E.2d 558, 561 (Sup. Jud. Ct. 1958); Lindsey Tavern v. Hotel & Restaurant Employees, 125 A.2d 207, 211 (not yet officially reported) (R.I. Sup. Ct. 1956); Board of Education v. Public School Employees Union, 233 Minn. 144, 45 N.W.2d 797, 802, 29 A.L.R.2d 424 (Sup. Ct. 1952); DeWilde v. Scranton Building Trades, etc., Council, 343 Pa. 224, 22 A.2d 897, 899 (Sup. Ct. 1941); People ex rel. Sandnes v. Sheriff of Kings County, 164 Misc. 355, 299 N.Y.S. 9 (Sup. Ct. 1937); Empire Ralph Corp. v. Moving Picture Oper. Union, 17 Misc.2d 601, 155 N.Y.S.2d 76, 79 (Sup. Ct. 1956). See also Devine Bros. Inc. v. International Brotherhood, etc., 145 Conn. 77, 139 A.2d 60, 62 (Sup. Ct. Err. 1958). But see Wiest v. Dirks, 215 Ind. 568, 20 N.E.2d 969 (Sup. Ct. 1939).
It must be observed that the New Jersey Legislature in adopting the Anti-Injunction Act was careful to avoid the use of the expression, "jurisdiction," which runs through the Norris-La Guardia Act, although following that statute in most other respects. Sources of direct legislative history *271 for the act in New Jersey are sparse, but there is good reason to believe that the omission to cast the curtailment of labor injunctions in terms of an express qualification of the jurisdiction of the Court of Chancery was the fear that this would risk judicial nullification of the act as unconstitutionally invading the "inherent jurisdiction" of that court. The reference to jurisdiction was exscinded in the 1938 bill (A-27) of the unenacted series of forerunners of the bill which became the adopted act. (See supra.) Supportive of the fear of invalidation were such decisions as Blanchard v. Golden Age Brewing Co., 188 Wash. 396, 63 P.2d 397, 405-406 (Sup. Ct. 1936); In re Opinion of the Justices, 275 Mass. 580, 176 N.E. 649, 654 (Sup. Jud. Ct. 1931); and In re Opinion of the Justices, 86 N.H. 597, 166 A. 640, 646 (Sup. Ct. 1933). Indeed, the act was actually held unconstitutional on that ground in Phelps Dodge, etc., Corp. v. United, etc., of America, 138 N.J. Eq. 3 (Ch. 1946), notwithstanding its omission of the reference to jurisdiction. (That holding was overruled on appeal. Westinghouse Electric Corp. v. United Electrical, etc., supra.)
In contradistinction to the federal court decisions deeming rigid adherence to the procedural requirements of the Norris-La Guardia Act compelled by the statutory curtailment of the "jurisdiction" of the inferior federal courts in labor cases, the courts in states where replicas of that act were adopted, while regarding the procedure as mandatory, yet tend toward requiring only substantial compliance, whether or not the language of "jurisdiction" is employed in the statute. See Brown v. Sucher, 258 Wis. 123, 45 N.W.2d 73, 75 (Sup. Ct. 1950); Bartenders, Hotel & R. Emp. Union v. Clark Restaurants, 122 Ind. App. 165, 102 N.E.2d 220, 223-224 (App. Ct. 1951); Boise Street Car Co. v. Van Avery, 61 Idaho 502, 103 P.2d 1107, 1113 (Sup. Ct. 1940). This seems to us a sensible and correct approach to the construction and application of our own act, particularly since it does not go to jurisdiction, thus subserving a meaningful implementation of the underlying statutory *272 purposes, but avoiding injustice to plaintiffs-employers in cases of insignificant or trivial procedural deviations.
The attack by defendants upon the delay feature of the case in their main appellate briefs was only tangential, but the court directed further briefs to be filed on the point and these have been considered. Plaintiff stresses that the delay in the making of findings and entry of the interlocutory injunction after the conclusion of the hearings is not attributable to it and that it should not be penalized therefor by being deprived of a merited injunction for procedural deficiencies. In ordinary situations the rule of prejudicial error might be invocable in support of that position. But, as we have seen, the procedural aspects of the Anti-Injunction Act are at the heart of its public policy. Since it is the plaintiff who is moving for relief dependent upon compliance with the act, it indulges, contributes to or tolerates a substantial default in its observance at its peril. It should call all the statutory requirements to the attention of the court, which undoubtedly would welcome the reminder. Such action would not imply disrespect of the judge, but, rather, entirely appropriate cooperation by the party. Defendants, for their part, emphasized at the opening of the hearings their insistence that every section of the act be complied with.
The failure here to make the necessary findings and otherwise perform the statutory mandate promptly upon conclusion of the hearings, independently fatal to the validity of the proceedings, is aggravated by defaults in compliance with the statute in connection with the entry of the restraint on September 16. The passing oral reference by the court at the end of the hearing that day to "illegal acts * * * in mass picketing" and to "inability of the proper flow of automobiles and trucks to the plant" seems not intended to have been, and cannot well be argued to constitute an express finding of the "specific" acts committed by defendants and "expressly complained of in the complaint" (section 55) (there was no amended complaint; the notice of the application for the September 16 restraint specified only *273 "illegal acts of violence and other unlawful acts"). In the first place, there was no proof of "mass picketing," as such, between September 14 and 16. Proof of one kind of illegality will not warrant finding another (and, in this instance, worse). Secondly, section 55 requires that the enjoined acts, as couched in the restraint, shall be as specific as the findings thereof made by the court. This is to avoid the former abuses of sweeping injunctions far transcending specific illegalities complained of or supported by proof. Vague generalities have no place either in findings or restraints. Frankfurter and Greene, op. cit., supra, Ch. III passim. See Fur Workers Union, Local No. 72 v. Fur Workers Union, 70 App. D.C. 122, 105 F.2d 1, 3 (D.C. Cir. 1939), affirmed per curiam, 308 U.S. 522 (1939). In Senate debate preceding the adoption of the Norris-La Guardia Act the proposed language, "except after findings of fact by the court to the effect," etc. was prognosticated as destined to become "the most significant words in the American system of law so far as labor disputes are concerned." 75 Cong. Rec. 5005 (1932). It is obvious that the oral comments of the court quoted above could not suffice as part of an injunction, within Section 55. No more would they do as findings of fact.
The formal order itself (September 16) is totally devoid of findings of basic facts underlying the affirmative conclusionary recitals, merely copying clauses a., b. and c. of Section 53 (but including in a. a finding of "illegal acts of further violence"). Clause d. of the section ("that plaintiff has no adequate remedy at law") is omitted entirely. Certainly no specific illegal acts are set forth, as there were in the Conclusions filed November 17, 1959. Perforce, the specific acts expressly complained of in the complaint are absent. Conclusionary recitals are no proper substitute for findings of basic facts. See Fur Workers Union, Local No. 72 v. Fur Workers Union, supra (105 F.2d, at pages 3-4, 17). The rationale of decisions in other areas distinguishing between basic or evidentiary fact *274 determinations and ultimate factual conclusions in the promotion of exact justice through the adjudicatory process is conspicuously pertinent in the application and enforcement of the Anti-Injunction Act. See Tomko v. Vissers, 21 N.J. 226, 239 (1956). ("The requirement of findings is far from a technicality and is a matter of substance * * *. A conclusion requires evidence to support it and findings of appropriate definiteness to express it.") N.J. Bell Tel. Co. v. Communications Workers, etc., 5 N.J. 354, 375 (1950); N.J. State Bd. of Optometrists v. Nemitz, 21 N.J. Super. 18, 32 (App. Div. 1952); Susquehanna, etc., Ass'n. v. Board of Pub. Util. Com'rs., 55 N.J. Super. 377, 404 (App. Div. 1959).
Plaintiff stresses, in answer to the foregoing and similar "technical" shortcomings of the restraints to which defendant has been subjected ever since September 16, 1959, that the interlocutory injunction (which is the same in purport except for one provision as the temporary restraint) "secures to the defendants in specific terms and in the fullest measure the right of peaceful picketing as defined in the statute itself. There is no bar to lawful picketing because of the offenses and infringements of the past." But this observation misses the essential point that it is the intent of the act that there be no injunction at all unless all the mandatory prerequisites of the statute be met, at least substantially. See Brown v. Sucher; Bartenders, Hotel & R. Emp. Un. v. Clark Restaurants; Boise Street Car Co. v. Van Avery, all supra. As seen above, the New Jersey authorities emphasize the mandatory nature, made explicit by the very statutory language, of the procedural pre-conditions, and thus preclude any injunction where they are not met. "Injunctions should not be granted merely because no demonstrable harm will result to the defendants by their issuance or to establish that past wrongs may have occurred." General Electric Co. v. Gojack, 68 F. Supp. 686, 691 (D.C.N.D. Ind. 1946). Again, the problem is one of prophylaxis. Compelling the punctilious observance of the statute in each *275 individual case conduces to its being followed in the generality of cases and thereby to reduction of the incidence of unfair employment of the injunction against labor  an objective ranking high in the public policy of this State.
Secondly, it is not accurate to say that this restraint secures the defendants' right of peaceful picketing. Paragraph c. of both injunctions enjoins "parading or patrolling, loitering or picketing about premises of plaintiff, or public streets or public sidewalks approaching thereto or in vicinity thereto except in such number or in such manner or in such places as hereinabove set forth in this Order." (Emphasis added) But the only picketing allowed is by six pickets ten feet apart "on the sidewalks and public streets outside and in front of each of the entrances to plaintiff's premises on East Pearl Street * * *." The sharp curtailment of entirely lawful parading, patrolling or picketing, plainly beyond "a prohibition of such specific act or acts as [are] expressly complained of in the complaint" or other illegal acts proven and found, even in the Conclusions of November 14, 1959, is apparent. The actual intent of the court may not have been that restrictive, but it is the language of the order which controls the picketer.
Moreover, section a. of both injunctions enjoins in unqualified terms "collecting or gathering or attempting to collect or gather * * * near the entrances * * * for the purpose of intimidating or coercing plaintiff's employees * * * or other persons having business with the plaintiff * * *." No such general intimidation or coercion was proven, certainly none which indicated a likelihood of continuance (there were, possibly, isolated or sporadic instances of intimidation not justifying a restraint; if the obstruction of the gates is considered coercive of employees or other persons, there was adequate restraint of such obstruction elsewhere in the order). Nor did it appear that the prospect of "substantial" as well as "irreparable" injury to plaintiff's property therefrom required that broad a restraint, or that as to any such incidents the balance of equities preponderated *276 in favor of plaintiff's being injured more by its denial than defendants by its grant. See Isolantite, Inc., v. United Electrical, etc., of America, supra (132 N.J. Eq., at pp. 623, 624).
We have dwelt upon the deficiencies in the procedure attendant upon the procurement and in the content of the September 16 restraint, notwithstanding that it is not the direct subject of the appeal, because they are relevant both to the injury to these particular defendants and to the repugnance to the broad purposes of the act inhering in the delay in deciding the merits of the application on the show cause hearings. In the particular circumstances of this case, the prior proceedings and the interlocutory injunction are to be regarded as integral. Had there been no restraint in the meantime, no significance would have attended the delay. But there was a restraint in effect throughout, three and a half months old when we heard this appeal. That fact alone constituted the failure promptly after the hearings either to vacate the restraint or to take the statutory steps prerequisite to its continuance a substantial violation of defendants' rights under the statute, and the extent of the delay warrants reversal. But the error assumes added gravity from the circumstance that the restraint was unlawful in the first instance because obtained and framed without complying with the statute in the material particulars noted.

IV.
Defendants have attacked other procedural phases of these proceedings which we have concluded would not alone have made the injunction vulnerable. The Conclusions by the trial court of November 17, 1959 are assaulted as deficient  and from this premise it is contended there was fatal error not curable by the subsequent Findings of Facts or interlocutory injunction.
Addressing the conclusion last asserted, we find it without merit. The statute directs no particular form for *277 the making and filing of the statutory findings. It suffices that they meet the substance of the legislative intent. Westinghouse Electric Corp., supra (139 N.J. Eq., at page 103). All that matters, in this regard, is that satisfactory findings have been made and filed before the restraint issues. We see no necessary invalidity, in itself, in the amendment or supplementation of the findings set forth in the Conclusions by the Findings of Facts.
It is not necessary for us here to analyze and appraise the Conclusions for sufficiency as to all the findings of fact material to the claim for injunctive relief and essential under the act. No attack of that scope is mounted thereon. In the main, adequate findings are to be found in that document. The omission therefrom of a finding of the absence of an adequate remedy at law, stressed by defendants, is repaired by its inclusion in the Findings of Facts.
Defendants argue that the finding in the Conclusions concerning reasonable efforts by plaintiff to settle the dispute is defective as couched in terms of lack of evidence to indicate the plaintiff had failed to make such efforts, i.e., in placing the burden of proof on the issue on defendants. There is a fair basis for difference of opinion as to where the burden belongs, under Section 54, and this is discussed in VI., hereinafter. In the Findings of Facts, however, the court concludes affirmatively that plaintiff "has made every reasonable effort to settle the labor dispute in question," etc., in the statutory tenor. As to failure to "comply with any obligation imposed by law which is involved in the labor dispute in question," the finding in the Findings of Facts is that "there is no believable evidence" thereof, and no fault can be found with this as defendants fail to point out any such obligation violated except as may be comprehended in the express statutory obligation to make reasonable efforts to settle the dispute by negotiation, governmental machinery for mediation, etc.

*278 V.
Plaintiff avers that if the procedural defaults hereinabove examined are to be held effective to deprive it of an injunction otherwise warranted by defendants' invasion of its property rights, the result is unconstitutional in two senses: (a) as a deprivation of plaintiff's property without due process of law in violation of the Fourteenth Amendment and of the New Jersey Constitution, Const. 1947, Art. I, par. 1, and (b) as impairing the inherent equity jurisdiction of the Superior Court, inherited from the former Court of Chancery by virtue of the Constitution of 1947. We are not afforded supporting argument of any extended scope, and are satisfied that neither position has merit. We treat the stated branches of the contention in inverse order.
The specific contention now made was rejected by the Court of Errors and Appeals in overruling a contrary holding in Westinghouse Electric Corp. v. United Electrical, etc., supra (139 N.J. Eq. 97, at pages 104, 107-111), affirming the decision, but not the views on the constitutionality of the Anti-Injunction Act, expressed by the Court of Chancery in Phelps Dodge, etc., Corp. v. United, etc., of America, supra (138 N.J. Eq. 3). The act was held not to impair the jurisdiction of the Court of Chancery to enjoin interference with property rights for which there was no adequate remedy at law, as it was construed to have made no change in the substantive law, but only to regulate the procedure for issuance of injunctions in labor disputes, and this in "[t]he furtherance of desirable industrial relations between the employer and the employee" (139 N.J. Eq., at pp. 104-105). It is self-evident that the regulation of procedure does not impair essential jurisdiction of courts. Moreover, the procedural provisions of the Anti-Injunction Act were in effect incorporated into the rules of court by the Supreme Court by R.R. 4:67-9, which reads: "The rules of court do not supersede N.J.S. 2A:15-51 to 58, *279 inclusive, relating to labor disputes." Under subsequent general acceptance of the view expressed in Winberry v. Salisbury, 5 N.J. 240 (1950), the Supreme Court is the exclusive constitutional authority for promulgation of regulations concerning practice and procedure in the courts. See Fischer v. Twp. of Bedminster, 5 N.J. 534, 539 (1950); cf. Outdoor Sports Corp. v. A.F. of L., Local 23132, 6 N.J. 217, 226 (1951). N.J. Constitution of 1947, Art. VI, Sec. 2, par. 3. In particular, the Supreme Court's power over rules supersedes that formerly vested in the Court of Chancery. Liberty Title & Trust Co. v. Plews, 6 N.J. 28, 43 (1950). There plainly thus remains no further basis, if ever there was, for the notion that the procedural regulation of the conditions for issuance, and the scope, duration and enforcement of injunctions in labor disputes, as laid down in the Anti-Injunction Act, breach the constitutional equity jurisdiction of the Superior Court.
Nor is there more merit in the asseveration that enforcement of the act, even to accord with its letter and spirit, by voiding the injunction under appeal, would deprive plaintiff of its property without due process of law. If, as our courts have held, the act effected no change in substantive law, leaving plaintiff's property rights intact as before, subject only to valid procedural regulation of the injunctive remedy, it will obviously not have been deprived of property without due process merely because of our insistence, to borrow the language of the Chief Justice, that "procedural requirements" be "satisfied" before application of "existing substantive law." See Ind. Dairy Workers, etc., v. Milk Drivers, etc., Local No. 680, supra (30 N.J., at p. 186). Indeed, these requirements were conceived in the Westinghouse Electric Corp. case, supra (139 N.J. Eq., at p. 111), as having "laid at rest the evils and abuses and hardships which the employee otherwise suffered" and thus given "true meaning to due process" on behalf of labor as defendant in injunction suits. For a general treatment of the problems implicated in the argument made under this heading by *280 plaintiff, see Annotation 146 A.L.R. 1245, at pp. 1247 et seq. (1943).
It may finally be noted that, in net result, our decision will not have altered the facts that plaintiff did enjoy the protection of the injunction at the time it needed it and that there has been no impairment of its rights since the interlocutory injunction.

VI.
Only because the court is not in full concurrence on the basis for disposition of the point do we extend this opinion to consider defendants' contention that the trial court erred in not denying the injunction for plaintiff's alleged failure to comply with section 54 of the act (N.J.S. 2A:15-54), which reads:
"No restraining order or injunctive relief shall be granted to any plaintiff who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."
This provision is identical with Section 8 of the Norris-La Guardia Act (29 U.S.C.A. § 108), is commonly found in the state acts patterned after the federal act, 4 BNA Lab. Rel. Rep., passim, and is frequently referred to as the "clean hands" provision of such legislation. See, e.g., Brotherhood of Railroad Trainmen v. Toledo, Peoria and W.R., 321 U.S. 50, 60, 64 S.Ct. 413, 88 L.Ed. 534 (1944).
Defendants do not assert that plaintiff has failed "to comply with any obligation imposed by law," etc., but only in complying with the subsequent requirement of the section that it make every reasonable effort to settle the dispute by the means specified. The complaint recites that plaintiff gave the union notice before June 20, 1959, as required by its contract, of its desire to negotiate a new contract to follow that expiring August 20, 1959, and that the parties *281 have been in negotiation thereon ever since, but without success despite "a number of bona fide offers to that end" by plaintiff. The answer of the defendants admits the negotiations but denies that plaintiff "carried on negotiations in good faith."
At the hearings only Van Ness, who headed the management negotiation team, testified on this point for the company. His instructions came from his immediate superior, Walker (who did not testify). While he apparently had been granted some bargaining discretion prior to the strike, he was not allowed to change the company's position at the mediation meetings after the strike. From the testimony of Van Ness and Sternotti, in composite, it appears that negotiations between the company and the union continued from late July through the time the strike was called, there having been some 12 or 15 bargaining sessions at which certain changes in the contract were conceded by both sides, including concessions of improvements in both pay and working conditions by the company. The day before the contract expired, on August 19, 1959, at the request of the Federal Conciliation Service, the management team, headed by Van Ness, and the union committee, headed by Sternotti, met with a Federal Conciliation Service Commissioner and a State Mediation and Conciliation Commissioner. A similar conference was held the next day, continuing until 10:30 P.M. and ending an hour and a half before the strike deadline in an inability to reach an agreement. After the strike commenced, two further meetings were held with the commissioners, one on August 27 and one on September 11, both apparently at the request and arrangement of the officials. Another tentative meeting date had been set at the time the court hearings commenced. Sternotti indicated he would not attend until the hearings were over. Van Ness indicated his willingness to continue discussions.
Defendants' claim that Van Ness' previous attendance and offers and his statement of future willingness did not represent a good-faith attempt by plaintiff to settle the dispute *282 is supported only by its emphasis upon the facts that Van Ness had no personal authority to change the company's position, that the position did not in fact change after the strike began, and that the plaintiff did not expressly indicate to defendants a willingness to reconsider its position and the union proposals. The only indication that the union's position was any less adamant is Sternotti's statement that the union was "flexible," was willing to bargain, and might make further concessions if the company would. This last is also implicit, however, in Van Ness' testimony. Certainly good faith does not necessarily require either party to yield, at any given point, sincerely held convictions as to what its position should be on the contested issues.
The court is required to make a subjective determination: was the company merely going through the motions of bargaining in good faith or was there substance to the bargaining? The pre-strike negotiations clearly appear to have been bona fide on both sides. That they were no longer so by the time of the court hearings and that the company had frozen its position to the extent that it was not willing to make further attempts to settle the dispute by reconsideration of the contested issues is certainly not a conclusion compelled by the evidence, and we do not deem it fairly warranted.
Under our cases, in order to satisfy the requirement of reasonable efforts to settle, etc., the employer has to
"confer, or offer to confer, with the representatives of the union; to listen attentively to what they have to say; to explain to them carefully his own position, and to reconsider that position in the light of all the facts and arguments presented by the union. The employer must be willing to continue this process as long as there is a prospect of a successful outcome, or until he finds himself driven to seek the aid of the court." Phelps Dodge, etc., Corp. v. United, etc., of America, supra (138 N.J. Eq., at page 13), affirmed sub nom. Westinghouse Electric Corp. v. United Electrical, &c., supra.
The basic requisite is that the negotiations be in good faith. Kidde Mfg. Co. v. United Elec., etc., of America, *283 27 N.J. Super. 183, 186 (Ch. Div. 1953). Moreover, bargaining requires more "than a willingness to enter upon a sterile discussion of * * * differences." See N.L.R.B. v. American Nat. Ins. Co., 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952) (construing section 8(a)(5) of the National Labor-Management Relations Act, 29 U.S.C.A. § 158(a)(5), making it an unfair labor practice for an employer to refuse to bargain collectively with the union's representatives). See also N.L.R.B. v. Darlington Veneer Co., 236 F.2d 85, 88 (4 Cir. 1956). Good faith was found in Kidde, supra, even though the company representative was its lawyer, was allowed little discretion by the company, and was considered by the union to be an outsider without personal knowledge to "assess the reasonableness of their position." In fact the lawyer was found to have "made little effort to explain the companies' position or to persuade the men to accept it." Kidde, supra, 27 N.J. Super., at pages 186-187. Good faith was nevertheless found. Apt here is Mr. Justice Frankfurter's observation in his concurring opinion on N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 155, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956):
"But it [good faith] is not necessarily incompatible with stubbornness or even with what to an outsider may seem unreasonableness. A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination. The appropriate inferences to be drawn from what is often confused and tangled testimony about all this makes a finding of absence of good faith one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation."
On the record before us, the determination was for the trial court. It saw and heard the witnesses. We see no reason to disturb its conclusion. Circumspection should be exercised in passing on such an issue, since the consequence of an adverse finding could, and here, would, be denial of *284 preventive relief for substantial injury to a plaintiff's property rights.
The limited authority of Van Ness does not call for a determination of lack of good faith in the negotiations. Compare Great Southern Trucking Co. v. N.L.R.B., 127 F.2d 180, 185 (4 Cir. 1942); cf. N.L.R.B. v. Hopwood R. Co., 98 F.2d 97, 100 (2 Cir. 1938). It is notable that despite such limited authority he nevertheless brought to the bargaining table concessions which have not been asserted to be insubstantial.
Under other circumstances we might feel warranted in examining fully the unsettled question as to which party bears the burden of alleging and proving failure by plaintiff to make reasonable efforts to settle. The framework and language of section 54, particularly in contrast with section 53, would seem to lay such burden upon the defendants (at least that of alleging). The trend of authority seems, however, to point the other way. See Brotherhood of Railroad Trainmen v. Toledo, Peoria & W.R., supra (321 U.S., at pages 60-64, 64 S.Ct., at pages 418-420); Dean v. Mayo, 8 F. Supp. 73, 76-7 (D.C. La. 1934); see also Dean v. Mayo, 9 F. Supp. 459 (D.C. La. 1934), affirmed 82 F.2d 554 (5 Cir. 1936); United Packing House Workers v. Wilson & Co., 80 F. Supp. 563, 569 (D.C.N.D. Ill. 1948); Donnelly Garment Co. v. International L.G. & W. Union, 99 F.2d 309, 316 (8 Cir. 1938), certification denied 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430 (1939); Carter v. Herrin Motor Freight Lines, 131 F.2d 557, 560 (5 Cir. 1942); Lipoff v. United Food Workers Industrial Union, 33 Pa. Dist. & Co. R. 599 (C.P. 1938); DeWilde v. Scranton Building Trades, etc., Council, supra (22 A.2d, at p. 899); Murrin v. Cook Bros. Dairy, 127 Ind. App. 23, 138 N.E.2d 907, 911-912 (App. Ct. 1956); Thayer Co. v. Binnall, supra (95 N.E.2d, at p. 199). We need not decide the point, having determined that the conclusion of the trial judge on this issue is warranted by the evidence, whatever the incidence of the burden.
*285 The injunction is reversed for the reasons stated, without costs (in this court). Since the action still pends, plaintiff is, of course, free to renew an application for restraint, following the statutory procedure, should subsequent events so require.
GOLDMANN, S.J.A.D. (concurring).
Except for Part VI of the main opinion, I agree with the views expressed by Judge CONFORD on behalf of the court, and particularly those comprising Part III relating to the substantial failure of the Chancery Division to comply with several of the mandatory requirements of the Anti-Injunction Act.
As for the factual background of the picketing complained of, there is no question in my mind that the company's actions exacerbated the situation. It unilaterally departed from its agreement with the union that shipments of pipe were to be made by company truck and rail, suddenly switching to leased carriers on Monday, September 14. Again, and for no good and apparent reason, the company arranged for certain of its supervisors to come to work that morning with photographic equipment in hand. And on Wednesday, September 16, there occurred the unprecedented situation of a large number of supervisory personnel descending upon the employees' gate No. 2 shortly before 8 A.M. (gate No. 1 being the one ordinarily used by management), creating a traffic jam which took more than an hour for the police to unravel. This surprising concentration of so large a number of cars exceeded the bounds of probability. There was also the lineup of cars inside the gate at lunch hour on Wednesday, aggravated if not inspired by company tactics. The same suspicion attends the lineup that occurred at 5 P.M. that day.
As the main opinion points out, the elliptical picket, first used briefly on the morning of August 21 and then put into operation on a fairly continuing basis on the morning of September 14, was obstructive and undoubtedly intended to harass management. Its character was such as to impede, if not block, free entry and exit of automobiles used by *286 supervisory personnel, as well as vehicles having business at the plant. As such, it exceeded the limits of peaceful picketing whose object is persuasion of those who are willing to stop and listen.
As Judge CONFORD observes, the supervisory employees and officers were all too ready to take advantage of this elliptical picket to improve the company's chance of getting a restraint. But when they acted, it was upon a situation of the union's own creation. Were it not for the union's undoubted purpose to use the picket for obstruction and harassment, the acts of the company representatives would come dangerously close to provocation of a sort which would bar its right to ask a court of equity for the extraordinary relief of an injunction.
Although perhaps unnecessary because the injunction must be set aside for the reasons stated in Parts I and III of the main opinion, I must express some reservation about what is contained in Part VI relating to good-faith bargaining.
In my view a fair reading of N.J.S. 2A:15-54, in the general setting of the Anti-Injunction Act and against the background of the Norris-LaGuardia Act on which it is modelled, places on a plaintiff the burden of proving it made every reasonable effort to settle the labor dispute by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration. The authorities cited in the next-to-the-last paragraph of the main opinion so hold.
I have, ever since this matter first came before us for leave to appeal and a stay of the restraint, entertained a considerable degree of doubt as to whether plaintiff fully established that it had bargained in good faith. My reading of the record does not entirely resolve that doubt. There was bargaining between the company and the union, in the accepted sense of the word, up to August 19, 1959. Sternotti testified that during those negotiations the company offered a slight increase in wages and also a slight change in working *287 conditions. For all that appears from the record, there seems to have been agreement on only one "section" or point, but neither side shed light upon just what that area of agreement might have been. After August 19 the company, acting through a negotiating committee headed by Van Ness, took the position that it would not change in any respect from its submitted proposals. Van Ness admitted that acting under instructions from his immediate superior, Walker, the company had not varied from its position. The testimony of Sternotti, who headed the union group at the bargaining table, was that the union was willing to discuss all issues; "we were willing to take any point in dispute and not make them the way the company wanted them, and not make them the way the union wanted them, and make them the way that both of us can live with."
Good-faith bargaining, as Mr. Justice Frankfurter said in N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 155, 76 S.Ct. 753, 100 L.Ed. 1027 (1955), is not necessarily incompatible with stubbornness. My difficulty arises from the scantiness of the record; we do not have a complete and detailed account from either side as to what happened, step by step, in the course of the negotiations which began in late July 1959. Again quoting from Mr. Justice Frankfurter, we do not have a satisfactory exposition of the "previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations" which constitute the "raw facts" for reaching a determination as to whether there was bargaining in good faith.
The inferences to be drawn as to just what was in the mind of either of the parties at the bargaining table left the finding of good faith pretty much to the judgment of the trial judge. If nothing more, he had the advantage of seeing and hearing the witnesses, and had the "feel" of the entire case. Reluctantly, I conclude that his determination that there was good-faith bargaining was not without reasonable foundation.
I join in the setting aside of the temporary injunction.
NOTES
[*] Now Fed. Rules Civ. Proc. rule 65, 28 U.S.C.A.